UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:   Sandia Tobacco Manufactures, Inc.,
         Domestic Profit Corporation,

Debtor.                                                             No. 16-12335-j11

**STATES' OBJECTION TO THE DEBTOR'S FIRST DISCLOSURE STATEMENT DATED JUNE 19, 2017**

The States[1] object to the *Debtor's First Disclosure Statement dated June 19, 2017* ("Disclosure Statement") because it fails to provide adequate information as required under § 1125 of the Bankruptcy Code. Specifically, disclosures on the below matters are inadequate, making it impossible for creditors to reasonably determine if the plan is feasible or has an adequate means of implementation. The States also join the *State of New Mexico's Objections to Disclosure Statement*.

1.  **Background.** The States regulate the Debtor's sale of cigarettes and other tobacco products in their respective states. The Debtor holds a tobacco product distributor's license and/or a tobacco manufacturers' license in several of these States and was, but no longer is, certified to sell its cigarette brands in most of them. As part of their regulatory responsibilities, the States enforce certain laws that require the Debtor, as a "Non-Participating Manufacturer" ("NPM")[2], to deposit into an escrow account, held for the benefit of each State,

---

[1] "States" refers collectively to the tobacco regulatory agencies of the States of Alaska, Arizona, Colorado, California, Idaho, Kansas, Missouri, Nebraska, New York, Nevada, Oklahoma, Oregon, and Washington—in all of which the Debtor has sold tobacco products.

[2] Tobacco manufacturers fall into two categories: those that have settled with the States and become "Participating Manufacturers" or "PMs" under the tobacco Master Settlement Agreement executed in November 1998 and make direct payments to the States in recognition of the health care costs imposed by their products, and those that have not settled, the NPMs, who must instead make deposits into an escrow account that are roughly equivalent in cost to the payments made by the PMs. The escrow account holds funds that may be utilized to satisfy judgments obtained by the States in cases filed against the NPMs with respect to their tobacco sales.

$6.55 per carton of cigarettes units sold in that State.[3] Failure to make timely escrow deposits can result in removal of the Debtor from a State's directory of approved tobacco manufacturers (a process called "delisting"), the treatment of the Debtor's products as unlawful contraband, and a requirement that the Debtor immediately cease making any further cigarette sales in that State.[4]

2. **The USDA Claim.** The United States Department Agriculture ("USDA") filed a timely proof of claim for priority taxes under § 507(a)(8) in the amount of $4,717,090.84. (Claim No. 7). This is the single, largest, non-insider claim in this case. However, the Disclosure Statement only lists $1,173,168.26 of this claim as a priority tax; the remainder ($3.5 million) is treated as a general unsecured claim. (D.S. at p. 10; and Ex. I). There is no explanation in the Disclosure Statement discussing this split (approximately 25% priority tax and 75% general unsecured). Has the USDA agreed to this reclassification? What is the Debtor's basis for disputing the USDA's claim that all $4.7 million is a priority tax? How did the Debtor determine that only 25% of the claim is a priority tax? When, in relation to the confirmation process, does the Debtor expect to object to this claim or otherwise have the priority amount reduced by 75%? Because of the magnitude and priority of this claim, it is not possible to make an informed judgment about the feasibility of the Debtor's plan without answers to the foregoing questions. Accordingly, the Disclosure Statement fails to contain adequate information for creditors to make an informed judgment about the plan as required under § 1125(a)(1).

3. **Sale of the Escrow Accounts.** The feasibility of the Plan also rests on the proposed sale of the Debtor's escrow accounts. In the Disclosure Statement, the Debtor states

---

[3] Each State has an escrow statute requiring NPMs to make escrow deposits on their cigarette sales, and these laws are substantially similar to each other. As an example, New Mexico's escrow statute is codified at NMSA §§ 6-4-12 to 6-4-13. The $6.55 is the current amount required to be deposited; it is adjusted for inflation each year.

[4] Collectively, these laws are called "Directory Laws" and were passed by the State to enhance their ability to enforce their escrow statutes. Each State has passed Directory Laws, and they are substantially similar to each other. New Mexico's Directory Laws are codified at NMSA §§ 6-4-14 to 6-4-24.

that it "anticipates minimum net revenue from the sale of its escrow funds to be approximately $600,000". (D.S. at p. 15). If this value is correct, then the Debtor's rights in its escrow funds are the most valuable asset in this bankruptcy estate. In addition, the Plan proposes using $496,000 of these sale proceeds to make an initial payment to the USDA on its priority tax claim on the Effective Date of the plan. Yet, while this sale is a cornerstone of the plan, there is almost no information about it in the Disclosure Statement. Is there currently a prospective buyer and, if so, who is that entity (i.e, is it an insider or an independent third-party)? Has a proposed sale agreement been reached? Will the sale occur pursuant to an auction, as is generally required? What is the basis for the Debtor's belief that $600,000 is an appropriate sale price or that it will be likely to obtain that amount? Has the Debtor determined whether the terms of the sale would be appropriate so as not to trigger objections by the States? How does the sale fit into the confirmation process? The Disclosure Statement is inadequate without providing answers to these questions.

4. In that regard, the Disclosure Statement also fails to explain that the escrow accounts are held for the benefit of the states in which the Debtor sold its cigarettes. As explained above, for a tobacco manufacturer to sell cigarettes lawfully in most states, it is required to establish escrow accounts in which it must deposit a certain amount for cigarettes sold in the underlying state. These deposits must be held for twenty-five years and made available to pay judgments or settlements obtained by the state on certain claims arising from the manufacturers' advertising and sale of its cigarettes, including, for example, health care costs related to smoking. These escrow accounts are established and regulated under state law. Any sale of the Debtor's rights in its escrow funds must be done in compliance with those state laws and approved by the underlying deposit states. According to the Debtor's June 2017, Monthly

3

Case 16-12335-j11    Doc 215    Filed 08/04/17    Entered 08/04/17 13:44:39 Page 3 of 8

Operating Report, it owns escrow accounts that hold total deposits in the amount of $5,382,446.75 for the benefit of the follow states: OR, NV, NE, MO, ID, CA, WA, OK, NY, NM, KS, and CO. (DOC 210, MOR June 2017, pp. 4-5). The States are willing to work with the Debtor and any prospective buyer to structure a sale in compliance with state law; however, they have no information from the Debtor about this proposed sale. The Disclosure Statement is inadequate because it fails to provide sufficient details about the terms of the sale to determine if it is structured in compliance with the applicable State escrow statutes.

5. **Sale of the Royal Brand.** The Debtor's plan also proposes selling its Royal cigarette brand post-petition if necessary to raise capital and estimates that the brand is worth $100,000. (D.S. at p. 16). Given the extremely narrow cash flow margins shown in the Plan's five year payment projections, it is very likely that this brand will need to be sold. (D.S. at Exhibit G). In fact, the five-year projections show negative "profits" each year and assume the sale of the Royal brand for $100,000 in year 2018. *Id.* Yet, the Disclosure Statement fails to provide any basis for the Debtor's belief that this brand is worth $100,000 or that it can be sold in 2018. Royal is fourth-tier, discount cigarette brand, which means that its success in the marketplace depends on how low it is priced, not brand loyalty like with Marlboro, which is a "premium" brand. What is the debtor's basis for its belief that this brand is worth $100,000? Have any parties expressed an interest in buying it? Why is its sale at the Debtor's discretion rather than required under the plan and its proceeds automatically paid to creditors? The Disclosure Statement is inadequate without answers to these questions.

6. **Past Due Escrow Deposits.** There are three states (NM, CA, and AK) in which the Debtor sold cigarettes but failed to make the required escrow deposits. The plan currently classifies the New Mexico escrow as a priority claim and the California and Alaska escrow as

4

general unsecured claims. The Disclosure Statement fails to explain why these claims are in different classes and why they are not given the same payment treatment. In addition, the Disclosure Statement and Plan list "NM Bank and Trust (Escrow Account)" has the claim holder for the past due escrow deposits owed under New Mexico's escrow statute. (D.S. at p. 11). This is incorrect. The bank holds the escrow account but has no authority to collect the escrow deposits. Only the State of New Mexico is authorized under the statute to enforce collection of escrow deposits for cigarettes sold in New Mexico and is, therefore, the correct party for this obligation. Similarly, California and Alaska are the correct parties to list for the past due escrow owed under their escrow statutes. The Disclosure Statement is inadequate until these issues are addressed and corrected.

       **7.**    **Five Year Plan Projections.** The Disclosure Statement projects that the Debtor's sales revenue will steadily increase over the five-year life of the plan, but fails to provide any basis for these very optimistic projections. (D.S. at Exhibit G). The Disclosure Statement also fails to inform creditors that the Debtor was "delisted" in two States (Washington and Idaho) during its bankruptcy because it no longer qualifies as the manufacturer for its cigarettes. Delisting means that it was removed from that state's directory of approved tobacco manufacturers and prohibited from selling its brands. In these States, and most others, only the entity that physically makes the cigarettes is eligible to be listed on the directory along with the brands that it makes. According to the Debtor, it has not made any cigarettes since January 2016 and has sold nearly all of its manufacturing equipment and continues to sell any remaining equipment as part of its plan. To be adequate, the Disclosure Statement needs (i) to provide information to support its sales projections, (ii) to explain the regulatory status of its Royal and Sandia brands including the states in which they can be sold now and are projected to be sold

during the plan period, and (iii) to provide for calendar years 2015, 2016, and YDT 2017, the same financial information in the same format as the five-year projections (D.S. at Exhibit G).

8. **Seneca Letter of Intent.** Attached as Exhibit L to the Disclosure Statement is a letter from Seneca Manufacturing to the Debtor. In it, Seneca states that the letter is a "binding Letter of Intent" and is intended to describe a "contractual framework" for Sandia to transfer the Sandia and Royal brands to it. It then recites that Sandia "presently holds the rights to manufacture the Sandia and Royal brands". However, Sandia does **not** own the Sandia trademark; WM does. And Sandia does not currently pay royalties to WM for its use of the trademark, so it is unclear how Sandia has a "right" to manufacture this brand, much less to transfer it to Seneca. The letter also recites that Sandia agrees to transfer these brands for "nominal consideration". How much is this, and why is it "nominal"? Also, Sandia represents and warrants in the letter that "it has paid all required State non-participating manufacturer escrow payments ("NPM" Payments), which may have been imposed as a result of Sandia's sales of the Brands, and that no amounts related to such NPM Payments are presently outstanding." This too is incorrect. Three states (NM, CA, and AK) have asserted past due escrow owed by Sandia, which obligations total about $120,000 in outstanding escrow. The Disclosure Statement fails to explain these inconsistencies or to explain this transaction in general and its significance to the plan.

9. **New Facility.** The Disclosure Statement states that the Debtor will be renting a smaller facility at less cost post-petition but also states that it will assume its existing lease. The Debtor fails to disclose why it needs two leases, the cost of assuming the old lease, and when the new lease would begin. Currently, the Debtor shares its warehouse with WM Distribution, Inc., ("WM"), a company also in bankruptcy and owned and operated by members of the same family

6

as the Debtor's shareholders and officers.  The Debtor states that WM "will begin paying its share of expenses that the Debtor paid pre-petition" and "will continue to share the rent in proportion to its use."  (D.S. at p. 16).  What is WM's portion of the new rent?  Was this amount determined by an insider of WM?  Will WM also pay its share of the rent under the existing lease, which the Debtor intends to assume?  Has WM agreed to relocate its business to the new facility?  (D.S. at p. 5).  Does WM need bankruptcy court permission to start paying these new expenses and relocate its business?  The Disclosure Statement is inadequate for its failure to provide this information.

10. **Cost Sharing with WM Distribution, Inc.**  As explained above, WM and the Debtor are owned and managed by members of the same family and their business operations are similarly intertwined.  WM is the Debtor's largest customer, buying the greatest portion of its cigarettes, and it owns the trademark to the Debtor's flagship brand "Sandia".  These companies share the same warehouse and have overlapping employees.  They have operated in tandem for years, yet now the Debtor claims that they will operate at arms-length from each other and "WM will begin paying its share of the expenses".  How?  The Debtor fails to disclose how this objectivity will be achieved or maintained over the life of the plan.  Moreover, did an insider decide how much each company should pay for common expenses?  Does WM have the cash flow to pay its new expenses?  Has it agreed to do so?  Does it need court permission?  As with the shared rent, the Disclosure Statement is inadequate because it fails to provide this information.

11. **Chapter 5 Recoveries.**  The Disclosure Statement states that it is evaluating whether it has Chapter 5 causes of action against D&D Properties, LLC, Donald Packingham, Della Packingham, and Donna Woody—all of whom are insiders of the Debtor.  If WM failed to

pay its share of the rent pre-petition, why is it not included? More importantly, how can creditors know that the Debtor will pursue any of these potential claims when they are all against insiders? How much are the amounts that are potentially recoverable? What were the underlying transactions that may give rise to these claims? Who would file and prosecute these suits? How would this litigation be paid for? How would creditors be assured that any recoveries would be paid to them? Disclosure Statement is inadequate because it fails to provide this information.

      WHEREFORE, the States asks this Court to deny approval of the Disclosure Statement as adequate.

Respectfully submitted,

PATRICIA MOLTENI

<u>/s/ electronically filed 8/4/17</u>
Patricia Molteni, Esq
Karen Cordry, Esq.
Counsel for the States

National Association of Attorneys General
1850 M Street N.W.
Washington D.C. 20036

I CERTIFY that I filed the foregoing electronically with the Court via the CM/ECF system. All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on the date of filing. I certify that I mailed the foregoing by first class mail to the following parties, at the addresses listed below, on August 4, 2017: none.

<u>/S/ Patricia Molteni</u>