UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: Sandia Tobacco Manufactures, Inc.,
Domestic Profit Corporation,

Debtor. No. 16-12335-j11

## STATES' OBJECTION TO THE DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §363(f) AND (m) TO SELL PROPERTY FREE AND CLEAR OF INTERESTS

On November 8, 2017, the Debtor filed the *Debtor's Motion Pursuant to 11 U.S.C. §363(f) and (m) to Sell Property Free and Clear of Interests* ("Sale Motion") (Doc. 267).[1] In its Sale Motion, the Debtor seeks to sell the trademark for its cigarette brand "Royal" to a Seneca Manufacturing Company ("Seneca") located in Salamanca, New York. The States[2] object to the Sale Motion because its description of critical aspects of this transaction such as the sale price, payment terms, assumed liabilities, default terms, remedies and other material terms is confusing, contradictory, and/or missing, making it impossible to determine both the actual financial impact of the sale on the estate and the regulatory issues arising from the proposed sale. The Debtor also fails to provide justification for structuring this as a private sale. Without this information, the Debtor cannot show that the sale of the Royal brand is an exercise of its sound

---

[1] On November 9, 2017, the Debtor filed a *Motion to Shorten Notice of the Deadline for Filing Objections* to its Sale Motion (Doc. 268). The Debtor's Motion to Shorten Notice was granted shortly after it was filed and before the States had the opportunity to object to it. The Debtor did not consult with counsel for the States before preparing the proposed Sale Agreement and did not seek input in advance from applicable state regulators even though the sale of the Royal brand raises numerous regulatory issues.

[2] "States" refers collectively to the tobacco regulatory agencies of the States of Alaska, Arizona, Colorado, California, Idaho, Kansas, Missouri, Nebraska, Nevada, Oklahoma, Oregon, and Washington—in all of which the Debtor has sold tobacco products. The States regulate the Debtor's sale of cigarettes and other tobacco products in their respective states. The Debtor holds a tobacco product distributor's license and/or a tobacco manufacturers' license in several of these States and was, but no longer is, certified to sell its cigarette brands in most of them. As part of their regulatory responsibilities, the States enforce certain laws that require the Debtor, as a "Non-Participating Manufacturer" ("NPM"), to deposit into an escrow account, held for the benefit of each State, $6.55 per carton of cigarettes units sold in that State. Failure to make timely escrow deposits can result in removal of the Debtor from a State's directory of approved tobacco manufacturers (a process called "delisting"), the treatment of the Debtor's products as unlawful contraband, and a requirement that the Debtor immediately cease making any further cigarette sales in that State.

1

business judgment and that the sale price is fair and reasonable.

The States also join the objection to the Sale Motion filed by the State of New Mexico [Doc 273].

**Absence of Competitive Bidding**

The Sale Motion, states in one sentence the basis for a private sale: "[t]he Debtor has extensively sought bids for the Royal Brand and Seneca made the best offer for purchase out of the 3 cigarette manufacturers that were serious possible purchases." Sale Motion at ¶23. This sentence fails to provide sufficient meaningful information about the efforts the Debtor made to market this asset; the responses it received; the range of offers; and why this offer was picked as the best. Absent such information, it is impossible to evaluate whether the price and terms proposed here are the best available to the Debtor.

**Purchase Price and Other Payment Terms**

Turning to the proposed Sales and Royalty Agreement ("Sale Agreement") itself, it quickly becomes apparent that it is incomprehensible, at least in terms of being able to determine the actual enforceable rights and obligations of each party. In particular:

1. The Sale Agreement contains conflicting and confusing provisions about the sale price and the "Royalty" payments, which comprise the bulk of the proposed compensation for the assets purchase. As a result, it is impossible to know how much Seneca is required to pay the Debtor for the Royal brand and when (or if) these payments will ever be made. Without this fundamental information, the Debtor cannot establish that this sale is in the best interests of the estate and its creditors.

2. Specifically, the Sale Agreement states in Section 2.3 (entitled *Purchase Price*) that the Buyer (Seneca) shall pay the Seller (Debtor) "the guaranteed payment of $100,000 (the

2

'Purchase Price')" and that this shall be paid as a $15,000 down payment made at Closing and $85,000 paid in the form of "royalty payments." Section 2.3(a). However, in Section 2.4(c) [3] (entitled *Royalty Payments*), the Sale Agreement states, "the total Royalty paid . . . shall not be less than, or exceed, $165,000.00 (or $200,000, in the event the provisions of Section 2.3(c) are triggered)." The Sale Agreement then reiterates that "[o]nce Royalty Payments to the Seller by the Buyer reach a total sum of $165,000.00 (or $200,000, in the event the provisions of Section 2.3(c) are triggered), Buyer's obligations to pay Royalties pursuant to this Agreement shall be terminated." Section 2.4(d). Thus, the *Purchase Price* provision lists the Royalty payments as $85,000, but the *Royalty Payments* provisions list them as either $165,000 or $200,000. Which provision of the Sale Agreement is correct? What is the amount of the Royalty payments?

3.     Similarly confusing are the Sale Agreement provisions discussing on which tobacco brand (Royal or Sandia) the "Royalty" payments are based and what the criteria are for payment. The Sale Agreement states that the "the Buyer shall pay a Royalty to the Seller for each Unit sold of the *Brands to Seller*". Section 2.4(a) (emphasis added.) Earlier in the Sale Agreement, "Brands" are defined as the "Royal©" brand families and "Unit" is defined as "a carton of 10 20-cigarette packages of cigarettes or filtered cigars." Sections 1.2 and 1.27. Taken together, these provisions require a Royalty to be paid on each "Unit" of Royal tobacco products that the Debtor buys from Seneca. But, contrary to this directive, the chart included later in Section 2.4(a) provides that the Royalty shall be paid based on sales of the "*Sandia*" brand. Section 2.4(a) (emphasis added.) Which provision is correct? Are the Royalty payments based on sale of the Royal brand cigarettes or the Sandia brand cigarettes? Each variation produces notably different results.

---

[3] The Sale Agreement has two provisions labeled Section 2.4(c). It is unclear if both paragraphs are intended or if one was supposed to be deleted. Regardless, this duplication adds to the confusion.

4. This brand distinction is important for other reasons. First, the Debtor does not own the trademark for the Sandia brand; WM Distribution, Inc., ("WM") owns this brand. Thus, WM, not the Debtor, controls whether Seneca continues to manufacture this brand and controls whether the Debtor can continue to buy this brand from Seneca and/or sell it to third parties. Second, Sandia brand cigarettes can only be sold in those MSA States in which the State has authorized it for sale. Generally, the manufacturer of the brand must obtain permission to sell its brands in any MSA State. To date, Seneca is not authorized (and is not trying to get authorized) to sell the Sandia brand in New Mexico or any other MSA State. Accordingly, if Royalty payments are based on the Debtor's continued ability to sell Sandia brand cigarettes, then collection of the Royalty payment may be purely illusory. Third, if these installment payments are based on sales of the Sandia brand, rather than the Royal brand, then it seems disingenuous at best to characterize them as "royalty" payments, which is how they are described in Sale Agreement and which further requires the Debtor to report them to the Internal Revenue Service as royalty payments. Section 2.4(e).

5. In addition, even if the total *amount* of the Royalty payments is clarified and the *brand* on which they are based is clarified, the Sale Agreement is still unclear about *when* these Royalty payments must actually be paid. Specifically, the Sale Agreement provides that the Royalty shall be paid by Seneca to the Debtor by deducting it "from the sale price on each invoice from the Buyer (Seneca) to the Seller (Debtor) for the Sandia units" (Section 2.4(c)),[4] and the amount of the Royalty deducted shall be "$.035 per Unit in Year 1 and $0.25 per Unit in Year 2 and beyond" (Section 2.4(a)). Thus, to receive any "Royalty" payments, the Debtor must continue to buy Sandia brand tobacco products from Seneca. However, there is no provision in

---

[4] This is the *other* Section 2.4(c), not to be confused with the Section 2.4(c) that sets the total amount of Royalty payments.

4

the Sale Agreement requiring the Debtor to buy a minimum number of Sandia Units from Seneca after the closing date. Nor is there any information in the Sales Agreement or the Motion showing the past volume of Sandia brand tobacco products sold by the Debtor. Without specifying a minimum monthly purchase volume or even requiring any purchases, it is not possible to calculate the minimum monthly Royalty payments or to estimate how long it will take for all Royalty payments to be made.

6. In addition, because the Royalty payments are in the form of a discounted price for future tobacco products purchased by the Debtor from Seneca, rather than installment cash payments from Seneca to the Debtor, realizing this "value" requires the Debtor to continue to: (i) stay in business, (ii) have the cash flow to pay the discounted price for these tobacco products, and (iii) have the regulatory authority to sell these tobacco products in the States in which the Debtor does business so as to be able to dispose of the products being purchased. Neither the Sale Agreement nor the Motion addresses these issues. In the absence of a confirmable plan of reorganization or at least a showing of feasible plan projections including the sales necessary to obtain the Royalties, it is unclear how the Debtor can show that it will be able to realize the full value of these "Royalty" payments or that they will benefit creditors.

7. Moreover, the Debtor states in its Sale Motion that it "proposes to use the sale proceeds to help fund its Plan of Reorganization and help pay the claims against it. Sale Motion at ¶ 16. However, the problems with the Royalty payments as discussed above show that the sale proceeds are not consistent with the Plan projections. The Plan projections showed that the Royal brand would be sold in 2018 for $100,000 in cash paid in full during 2018. Disclosure Statement at Exhibit G. This amount was needed to leave the Debtor with even minimal operating cash flow for the year. Yet, under the proposed Sale Agreement, the Royalty payments

5

are likely to be spread out over several years with no guarantee they will ever be satisfied.

8. Even more fundamentally, the Sale Agreement fails to explain what happens to Seneca's obligation to make Royalty payments if the Debtor does not buy Sandia brand products from Seneca. Are no Royalty payments owed? Similarly, what happens to Seneca's obligation to make Royalty payments if the Sandia brand is not lawful for sale (because Seneca and its brands are not listed on the State's approved Tobacco Manufacturer Directory) in the States in which the Debtor is licensed as a tobacco product distributor? Is Seneca in default on the Sale Agreement? There are also no provisions if Seneca simply fails to make payments or fails to supply the requested product. In all of those scenarios, what are the Debtor's remedies in terms of collecting the unrealized value of the Royalty payments? Is there a maximum time period over which the Royalty payments cannot extend? The Sale Agreement fails to address any of these contingencies, which renders the Royalty payments very uncertain.

9. Like the Royalty payments, the $15,000 down payment is also very uncertain. Under the Sale Agreement, the $15,000 down payment due at closing will instead be added to future Royalty payments if the "Brands are not in the market place during the period between the date of execution of this Agreement and the Closing Date for any reason whatsoever . . . and the Units Sold drop to less than the amount shown on Schedule 2.3(c) [122 cases (30 count) of Royal Cigarettes per month]." Section 2.3(c) and Schedule 2.3(c). It is impossible to determine from the Sale Agreement when this contingency may arise because it fails (i) to explain what is meant by the term "market place,"[5] (ii) to list the execution date of the Sale Agreement, and (iii) to explain where the Royal brand is currently lawful for sale and the volume sold there during the

---

[5] Is one state enough to be the "market place"? Two? All states? Do sales include those on tribal lands? Who is responsible for ensuring that the cigarettes *are* available in the marketplace – this is normally a duty that falls on the manufacturer, so it is appropriate for Seneca to be in a position to relieve itself of any obligation to pay based on its own failure to act?

6

relevant time period. This is also confusing because the Sale Agreement now returns to sales of the *Royal* brand as a criterion, while before it was dealing with sales of the *Sandia* brand. In the absence of information about whether Royal is being sold, where it is being sold, and by who, it is impossible to determine if the estate will realize even the $15,000 down payment for the Royal brand.

**Other Sale Agreement Provisions That Add to the Confusion**

There are a host of other provisions in the Sale Agreement that are also problematic. Many, but not all, are listed and discussed below. In light of the numerous and fundamental flaws in the most critical terms of the Sale Agreement, the States reserve their rights to object to further provisions in the Sale Agreement until such time as the problems identified in this Objection are resolved.

10. **Escrow Liability on Sales before the Closing Date.** The Sale Agreement also fails to clearly set forth the liabilities being assumed by Seneca. The title of Section 5.1 is "Escrow Liability on Sales on and Before December 31, 2016"; however, the first subsection states "Buyer (Seneca) agrees to be solely responsible for all Escrow Liability for sales of the Brands on and before the *Closing Date* of this Agreement. . ." Section 5.1(a) (emphasis added). Which is correct? The Closing Date or December 31, 2016? Also, does this provision include escrow liability owed on pre-petition cigarette sales? Also, whatever the correct time period, assuming there is outstanding escrow owed and Seneca assumes that liability, when is Seneca required to make these assumed escrow deposits? Will Seneca make the deposits into the Debtor's qualified escrow account or its own?

11. **Escrow Liability on Sales after the Closing Date.** The Sale Agreement also provides that the Buyer "shall be solely responsible for all Escrow Liability for sales after the

Closing Date". Section 5.2(a). Does this escrow liability include cigarette sale made while the Debtor was listed as the approved manufacturer on State directories? If so, will the escrow deposits be made into the Debtor's or Seneca's escrow account? To determine regulatory compliance with state tobacco laws, these questions must be answered.

12. Under this same provision, Seneca is required to pay for the "cost and expense" of maintaining all "required State registrations necessary to sell the Brands into a given state" unless the Debtor "sells less than 250 (60 count) cases of tobacco products per year into a specific State with the Exclusivity Zone," then the Debtor "shall be liable for all expenses necessary to maintain all required State registrations necessary to sell the Brands into the State." Section 5.2(c). The Sale Agreement fails to identify what the "required State registrations" consist of. It also fails to define "Exclusivity Zone". Most significantly, it fails to estimate the cost and expenses that may be shifted to the Debtor, which may render the Debtor's plan unfeasible. And it fails to address the likelihood of the Debtor satisfying this sales benchmark, which would otherwise trigger this cost shifting provision. If these costs and expenses exceed the amount of the Royalty payments, then this "sale" could actually cost the Debtor money.

13. **Exclusive Right to Sell, Section 3.** Under this provision, the Debtor is given "an exclusive right to sell the brand family "Royal" in the State of New Mexico, Washington, Idaho, Nevada, and Texas for a period of 20 years following the closing Date of this Agreement" unless the Debtor's sales of this brand in these states fail to grow by at least 3% each year. While the Debtor has an exclusive right to sell the Royal brand, its ability under state law to sell Royal cigarettes in these states (except Texas) depends, in part, on Seneca being properly listed as the manufacturer of the Royal brand on the Directory of these States. Critically, the Sale Agreement is silent on the Debtor's remedies if Seneca fails to obtain or maintain these Directory listings.

8

This risk appears to be borne entirely by the Debtor. There is also no information on which to judge the likelihood of the Debtor satisfying these sales growth targets or the financial harm to it if it fails to meet them.

14. **Released Claims, Section 5.4.** These provisions appear to redistribute liability for potential Released Claims between the Debtor and Seneca. It is unclear why the parties are making this redistribution, but regardless, the Sale Agreement should make clear that these provisions have no impact on the States' rights to pursue Released Claims against either party and in no way alter the rights of the States under state law to satisfy judgments or settlement of Released Claims from the funds in the respective party's qualified escrow fund.

15. **Substantial Equivalence, Section 6.** In this provision, if any of the Royal brands fail to meet the federal law requirement for Substantial Equivalence, "the Exclusivity and Royalty provisions of this Agreement shall terminate with respect to the specific Brand for which Buyer has been notified is no longer eligible for sale under Federal Law." Section 6.3. The Debtor fails to provide any information about the likelihood of its Royal brands failing to meet the Substantial Equivalence standard or the likely timing of this determination. This contingency could eliminate any value to estate of this sale.

16. **MSA Issues, Section 8.6.** This provision requires Seneca to receive the following: "receipt by the Buyer of a letter from the Settling State to which escrow is owed by the Seller under the Model Escrow Agreement of such Settling State that the Seller and the Brand Families are or remain eligible to be listed on the Settling State's directory of compliant brands and tobacco product manufacturers." Section 8.6(b). The States are unaware of any actions taken by the Debtor to obtain such a letter from the applicable States.

9

WHEREFORE, the States asks this Court to deny approval of the Sale Motion unless and until all of the issues set forth above are satisfactorily resolved.

                                                Respectfully submitted,

                                                PATRICIA MOLTENI

                                                /s/ electronically filed 11/22/17
                                                Patricia Molteni, Esq
                                                Karen Cordry, Esq.
                                                Counsel for the States

                                                National Association of Attorneys General
                                                1850 M Street N.W.
                                                Washington D.C. 20036

I CERTIFY that I filed the foregoing electronically with the Court via the CM/ECF system. All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on the date of filing. I certify that I mailed the foregoing by first class mail to the following parties, at the addresses listed below, on November 22, 2017: none.

/s/ Patricia Molteni