UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: Sandia Tobacco Manufactures, Inc.,
Domestic Profit Corporation,

Debtor.                                    Case No. 16-12335-j11

**<u>LIMITED OBJECTION BY THE STATES TO THE DEBTOR'S MOTION TO ASSUME
AND ASSIGN ESCROW AGREEMENTS UNDER 11 U.S.C. §365(a) AND (f) AND
MOTION PURSUANT TO 11 U.S.C. §363(f) AND (m) TO SELL PROPERTY FREE AND
CLEAR OF INTERESTS</u>**

On March 2, 2018, the Debtor filed *Debtor's Motion to Assume and Assign Escrow Agreements under 11 U.S.C. §365(a) and (f) and Motion Pursuant to 11 U.S.C. §363(f) and (m) to Sell Property Free and Clear of Interests* ("Sale Motion") (Doc. 305).[1] The States of Alaska, Colorado, California, Kansas, Nevada, New York, Oklahoma, Washington, and New Mexico (collectively, "States"), through their respective undersigned counsel, file this limited objection to the Sale Motion.

1. The States object to the Sale Motion to the extent that the terms of the sale are contrary to the state laws that regulate the Debtor as a tobacco product manufacturer and a distributor. The state laws at issue are discussed below.

2. Counsel for the States have discussed their objections with Debtor's counsel and believe that they are generally in agreement about how to resolve them and that these resolutions can be implemented through a final sale agreement and an appropriate sale order. However, these provisions have not yet been finalized; therefore, this limited objection is being filed to protect the States' interests.

---

[1] On March 7, 2018, a similar sale motion was filed in the related bankruptcy case, *In re WM Distribution, Inc.,* case no. 17-10535. Paralleling filings were made in both cases because the Sale Motion involves certain assets owned by Sandia and one asset owned by WM Distribution.

1

**Brief Regulatory Background**

3.　The States regulate the Debtor's sale of cigarettes and other tobacco products in their respective states. The Debtor holds a tobacco product distributor's license and/or a tobacco manufacturers' license in several of these States and was, but no longer is, certified to sell its cigarette brands in any of them except New Mexico. As part of their regulatory responsibilities, the States enforce certain laws that require the Debtor, as a "Non-Participating Manufacturer" ("NPM")[2], to make escrow deposits under their escrow statutes[3] and to qualify for listing under their directory statutes. Failure to make timely escrow deposits can result in removal of the Debtor from a State's directory of approved tobacco manufacturers (a process called "delisting"), the treatment of the Debtor's products as unlawful contraband, and a requirement that the Debtor immediately cease making any further cigarette sales in that State.[4]

4.　State escrow statutes require the Debtor to deposit a certain dollar amount per unit sold of cigarettes that its sells in that state and to establish an escrow account, referred to as a Qualified Escrow Fund ("QEF"), in which to make these deposits. The escrow deposits are held for the benefit of the State in which the cigarettes were sold and must be held for at least twenty-five years and made available to pay judgments or settlements obtained by the state on certain claims (known as "Released Claims") arising from the manufacturer's advertising and

---

[2] Tobacco manufacturers fall into two categories: (1) those that have settled with the States and become "Participating Manufacturers" or "PMs" under the tobacco Master Settlement Agreement executed in November 1998 and make direct payments to the States in recognition of the health care costs imposed by their products, and (2) those that have **not** settled, the Non-Participating Manufacturers ("NPMs"), who must instead make deposits into an escrow account that are roughly equivalent in cost to the payments made by the PMs. The escrow account holds funds that may be utilized to satisfy judgments obtained by the States in cases filed against the NPMs with respect to their tobacco sales.

[3] Each State has an escrow statute requiring NPMs to make escrow deposits on their cigarette sales, and these laws are substantially similar to each other. As an example, New Mexico's escrow statute is codified at NMSA §§ 6-4-12 to 6-4-13. The $6.55 is the current amount required to be deposited; it is adjusted for inflation each year.

[4] Collectively, these laws are called "Directory Laws" and were passed by the States to enhance their ability to enforce their escrow statutes. Each State has passed Directory Laws, and they are substantially similar to each other. New Mexico's Directory Laws are codified at NMSA §§ 6-4-14 to 6-4-24.

sale of its cigarettes, including, for example, health care costs related to smoking. Any funds remaining twenty-five years after they were first deposited may be released back to the NPM. In addition, to establish a QEF account, the NPM must use an escrow agreement specifically approved by each state in which it sells it cigarettes. This escrow agreement implements the requirements of the escrow statutes and similarly requires the deposit of escrow for the NPM's cigarette sales.

5. The directory statutes prohibit the sale of cigarettes in a state unless the manufacturer and its brands qualify for listing on the state's approved tobacco manufacturer directory. To qualify, an NPM must be in compliance with its escrow obligations in addition to other requirements. If an NPM is on the directory and fails to comply with its escrow obligations, it can be remove from the directory or "delisted". Once delisted, it is unlawful for the NPM to sell any of its cigarette brands in that state, and, at the expiration of a sell-through period, if any, its brands become contraband and may be seized. This delisting may also disqualify the NPM or its brands from being on the directory of other states.

**The Debtor's Sale Motion:**

6. During the course of its business, the Debtor made and sold several brands of cigarettes including the "Royal" brand and the "Sandia" brand. The Debtor deposited escrow for the sale of these cigarette brands into a QEF account held at New Mexico Bank and Trust. This QEF account currently holds about $4 million divided among sub-accounts held for the benefit of California, Colorado, Kansas, New Mexico, Nevada, New York, Oklahoma, and Washington.

7. In its Sale Motion, the Debtors seeks to sell the Sandia and Royal brands under 11 U.S.C. §363(f) and to assume and assign its QEF escrow agreement under 11 U.S.C. §365(a).

**All Escrow Liability Arising from Pre-Closing Brand Sales Must be Fully Satisfied:**

8. The Debtor owes escrow for both pre-petition and post-petition sales of its Royal and Sandia brand cigarettes. For pre-petition sales, the Debtor owes escrow in the aggregate amount of $125,379.49 for sales made in New Mexico ($103,664.21), California ($21,675.02) and Alaska ($40.26). It owes escrow for post-petition sales in the estimated amount of $4,000 for sales in Nevada and $25,000+ for sales in New Mexico.

9. The proposed Buyer of these brands, Xcaliber, is also an NPM. As an NPM, Xcaliber can only sell the Sandia and Royal brands in New Mexico, California, Alaska, Nevada, and other states, if they qualify for listing under their respective directory statutes. To qualify, these Brands, among other requirements, must have all escrow obligations satisfied.

10. Under the Asset Purchase Agreement, as a condition to closing, the Buyer must receive a letter from all of the States with outstanding escrow obligations owed by the Debtor providing that both Sandia (and an NPM) and the Brands (Royal and Sandia) "are or remain eligible to be listed on the Settling State's directory of compliant brands and tobacco manufacturers". (APA, ¶ 3.3(b)). Consistent with their directory statutes, none of these States can provide such a letter until the outstanding escrow obligation for sales in their State is fully deposited.

11. Without satisfaction of all outstanding escrow arising from pre-closing sales of Sandia and Royal brand cigarettes, state directory laws prohibit the Buyer from selling these Brands in the affected states. Any provisions of the APA or Sale Motion that seek to sell these Brands without satisfying outstanding escrow liabilities are contrary to state law and not permissible.

12. In addition, as discussed above, the Debtor's escrow agreement establishing its QEF account incorporates the Debtor's obligations to make escrow deposits. When this

4

agreement is assumed by the Debtor under 11 U.S.C. § 365(a), any defaults must be cured at the time of assumption. To cure the Debtor's failure to make the required escrow deposits, funds must be fully deposited into the applicable QEF sub-account on or before the Sale closing date. To determine the outstanding escrow owed on all pre-closing sales, the Debtor must provide adequate records and in sufficient detail to the States showing when it ceased selling cigarettes, accounting for all cigarette sales made post-petition, and accounting for the deposit status of all escrow obligations arising from these sales.

**Transfer of the Debtor's QEF Account and Preservation of Released Claims:**

13. The APA seeks to transfer "any and all rights the Sellers hold in the Qualified Escrow Fund" and requires that the QEF "be transferred in a manner that permits the Buyer to hold such funds in the name of the Buyer." (APA, ¶ 2.1(g)).

14. The APA further requires, as a condition to closing, that the Buyer receive a "letter from each of the Settling States for whose benefit the Qualified Escrow Funds are held permitting the transfer of the corpus of such funds to the Buyer to be held in escrow under the terms of the Model Escrow Statute." (APA, ¶ 3.3(c)).

15. To satisfy these conditions, the APA and Sale Order must clarify that the Debtor's rights to the funds deposited in the QEF are limited by the escrow statutes and the escrow agreement and that the Buyer is only able to receive those same rights currently held by the Debtor and may not acquire greater or different rights. Accordingly, the Buyer receives the QEF account subject to the States' rights to satisfy a Released Claim judgment or settlement obtained against the Debtor or against the Buyer, as its assignee, from the deposits in the account. In addition, just like the Debtor, the Buyer may only receive earnings on the account and remaining principal, if any, after a minimum of 25 years from its first deposit.

5

16. In addition, to permit the Buyer to hold the QEF account in its name rather than the Debtor's, the Buyer will need to execute an escrow agreement acknowledging the Buyer as the assignee and successor to the account. Under the directory statutes, this escrow agreement must be approved by each deposit state.

17. Any provisions in the APA or Sale Order that seek to prejudice the States' rights to satisfy Released Claim judgments or settlements from the QEF or to relieve the Buyer from the same obligations as the Debtor under the escrow statutes and the escrow agreement are contrary to state law and impermissible.

**The APA Arbitration Provision Does Not Apply to the States:**

18. The APA also contains a mandatory arbitration provision, which is broadly defined in its scope to include "all disputes between the Parties, including all those related to the existence, scope or validity of this Agreement". (APA, ¶ 7.1).

19. The APA and Sale Order must clarify that any disputes involving the States are not covered by this provision.

**Correcting Deposits Made in the QEF for Brands Other than Sandia or Royal**.

20. The Debtors maintain two different QEF accounts: (i) one for deposit of escrow owed on Sandia and Royal cigarette sales, and (ii) another for deposit of escrow owned on the sale of other cigarette brands. The former account is subject to the Sale Motion. Based on information and belief, there may be about $25,000 in deposits made into the Sale Motion escrow account that should have been deposited in the other QEF account. If escrow was applied to the wrong account, this error must be corrected before the Sale Motion QEF is transferred to the Buyer.

WHEREFORE, the States ask this Court to deny approval of the Sale Motion unless and

until all of the issues set forth above are satisfactorily resolved.

          Respectfully submitted,

          PATRICIA MOLTENI

          /s/ electronically filed on 3/23/18
          Patricia Molteni, Esq
          Karen Cordry, Esq.
          *Counsel for the States of Alaska, Colorado, California, Kansas, Nevada, New York, Oklahoma, and Washington*

          National Association of Attorneys General
          1850 M Street N.W.
          Washington D.C. 20036
          202-326-6251
          pmolteni@naag.org
          kcordry@naag.org

          HECTOR H. BALDERAS,
          New Mexico Attorney General

          /s/ electronically filed on 3/23/18
          James C. Jacobsen
          Assistant Attorney General
          *Counsel for the State of New Mexico*

          201 Third Street NW, Suite 300
          Albuquerque, NM 87102
          (505) 717-3527
          (505) 318-1050 (fax)
          jjacobsen@nmag.gov

I CERTIFY that I filed the foregoing electronically with the Court via the CM/ECF system. All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on the date of filing. I certify that I mailed the foregoing by first class mail to the following parties, at the addresses listed below, on March 23, 2018: none.

/s/ Patricia Molteni