# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:  SANDIA TOBACCO MANUFACTURERS, INC.        Case No. 16-12335-j11
A New Mexico corporation.

Debtor.

<u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on cross motions for summary judgment on Debtor's

objection to the United States Department of Agriculture's (the "USDA") proof of claim. *See*

Docket Nos. 300 & 311. Debtor manufactured cigarettes, cigars, and other tobacco products. As

a tobacco manufacturer, Debtor is subject to the federal Fair and Equitable Tobacco Reform Act

of 2004 ("FETRA"). 7 U.S.C. § 518d. Under FETRA, the Debtor was subject to assessments

starting in 2004 to fund the USDA's payments to stabilize the tobacco industry as tobacco

farmers transitioned to the free market. If the assessments are "excise taxes" under FETRA the

amount due is entitled to priority status under 11 U.S.C § 507(a)(8)(E).[1] The Debtor objects to

the USDA's proof of claim on the basis that the FETRA assessments are not excise taxes and

therefore give rise to a nonpriority unsecured claim under § 507(a)(8)(E). The USDA does not

agree and asks the Court to find that the claim is entitled to priority status.

The issues presented in the cross motions for summary judgement can be distilled to the

following: (1) whether the FETRA assessments are excise taxes or regulatory fees; (2) if the

FETRA assessments are not regulatory fees, whether the assessments should be characterized as

excise taxes or customs duties; and (3) if the FETRA assessments are excise taxes, when the

taxed transactions occurred. As explained below, the Court will grant the USDA's motion for

summary judgment in part. The FETRA assessments are excise taxes entitled to priority status to

---

[1] All future references to "Code," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United
States Code, unless otherwise indicated.

the extent the tax was imposed on the removal of tobacco product for sale within the three years prior to the commencement of the Debtor's bankruptcy case.

<u>FACTS AND BACKGROUND</u>

Prior to FETRA's enactment, Depression era tobacco subsidies set quotas and allotments, provided price support and resulted in "an overly-bureaucratic, government-controlled system which [wa]s unable to respond to market pressures and opportunities." 150 Cong. Rec. H8718. Tobacco farmers were only able to market according to their quotas or allotments. *See* 7 U.S.C. §§ 1281 (repealed); *see also* Declaration of Darlene A. Soto, Tobacco Transition Program Manager of the Farm Service Agency, United States Department of Agriculture, at ¶ 6 (the "Soto Declaration"). The Depression era price support system enabled the federal government to purchase "tobacco through non-recourse loans issued through special price support associations at a particular price as tobacco farmers were unable to find buyers at the same or higher prices." Soto Declaration ¶ 2. The price support system artificially inflated the prices of domestic tobacco. *Id.*

Congress enacted FETRA in 2004 to end the Depression era tobacco subsidies, transition tobacco farmers to the free market by providing payments to the farmers, and recoup the cost of the payments by levying assessments on tobacco manufacturers and tobacco importers. In enacting FETRA, Congress responded to the effects diminishing tobacco use that resulted in diminished tobacco quotas. The diminished quotas devastated tobacco farmers who saw up to a fifty percent decrease in quotas, and therefore their income, over five years. 150 Cong. Rec. H8718 ("Since the late 1990s, burley tobacco quotas have been cut in half, causing significant financial loss for family farmers who currently earn less than half the amount they could have earned only 5 years ago."). With diminished quotas and price supports artificially inflating the domestic tobacco market the Depression era program "promise[d] little more than bankruptcy

-2-

and foreclosure [for farmers] . . . [and] promise[d] economic collapse for their communities."

150 Cong. Rec. H8717. A congressman from North Carolina described the effect of the

Depression era program on his district:

> Mr. Speaker, there are 1,040 tobacco producers in my congressional district producing a crop of 35,147 acres of land. Every single one of these producers is in dire straits. They are cashing in their retirement to continue farming. They are mortgaging their houses to stay in business. They are going deeper and deeper into debt. A buyout is not a luxury payment, it is a desperately needed infusion into an economy that depends on a depression-era program that no longer works. Even farmers that would ordinarily be wealthy are instead being told by their bankers that their loan will have to be reevaluated in future years.

150 Cong. Rec. H8718-19. In addition, supporters of FETRA believed that "[e]liminating the

current quota system will make American tobacco leaf . . . more competitive on the world

market." 150 Cong. Rec. H8717.

As such, Subtitle A of FETRA repealed in full the marketing quotas, tobacco controls,

parity payments, acreage allotments, and price support systems that had previously subsidized

tobacco farmers. American Jobs Creation Act of 2004, sec. 611. Termination of Tobacco Quota

Program and Related Provisions, PL 108–357, October 22, 2004, 118 Stat 1418. FETRA did not

phase out the subsidies but instead repealed them on the effective date of the statute. *Id.*

Because the then existing subsidies supported tobacco farmers' livelihoods and

artificially inflated domestic tobacco prices, under Subtitle B of FETRA Congress created the

Tobacco Transition Payment Program (the "TTPP") to enable the tobacco farmers to transition to

and be competitive in the free market. *Id.* Tobacco farming's history of regulation led to a fear

that "when tobacco quotas are eliminated, U.S. production of tobacco leaf will skyrocket, and the

prices will plummet." 150 Cong. Rec. H8723.

Under FETRA, the USDA paid eligible tobacco farmers transition payments for 10 years.

These payments, sometimes known as TTPP payments, were enacted to "give many debt-ridden

tobacco growers a chance to either retire with some dignity, invest in production of a different crop or restructure their current tobacco production." 150 Cong. Rec. H8717. To be eligible for the TTPP payments, tobacco farmers had to prove that they had previously been subject to the tobacco subsidy system. Those eligible tobacco farmers received TTPP payments based on the pounds of tobacco produced, the old marketing quota under the Agriculture Adjustment Act of 1938, or by multiplying the acreage allotment by the average production yield for the county. 7 U.S.C. § 518a(c). As set out in the statute, these payments represented full and fair consideration for the termination of the prior tobacco subsidies. 7 U.S.C § 518a(a). Congress authorized the Secretary of Agriculture to make payments totaling $10,140,000,000 under the TTPP. 7 U.S.C. § 518f.

FETRA also established a Tobacco Trust Fund within the Commodity Credit Corporation and backed by the United States Treasury. 7 U.S.C. § 518e; 15 U.S.C. § 714. TTPP payments to tobacco farmers where made from the Tobacco Trust Fund. 7 U.S.C. § 518e. To defray the costs of the TTPP to the general public, Congress imposed assessments on tobacco manufacturers and tobacco importers. 7 U.S.C. § 518d; *See also* 150 Cong. Rec. H8710, ("The tobacco companies now have to step up and put the money up to do this so that the growers and farmers are not penalized anymore in the tobacco business."). Congress delegated the authority to collect the assessments to the Secretary of Agriculture, and the funds collected as a result of the assessments were placed into the Tobacco Trust Fund. 7 U.S.C. § 518d(b) ("The Secretary . . . shall impose quarterly assessments during each of fiscal years 2005 through 2014 . . . on each tobacco product manufacturer and tobacco product importer that sells tobacco products in domestic commerce in the United States during that fiscal year."); 7 U.S.C. § 518e.

-4-

The FETRA assessments ran from fiscal year 2005 through fiscal year 2014. 7 U.S.C. § 518d(b). Each tobacco manufacturer or importer's share was based on a two-step calculation set out in the statute. 7 U.S.C. § 518d. Step A of the calculation divided the types of tobacco manufacturers and importers into six product classes: cigarettes, cigars, snuff, roll-your-own tobacco, chewing tobacco, and pipe tobacco. 7 U.S.C. § 518d(c)(1). Step B of the calculation allocated the assessment based on the share of gross domestic product sold by each class of products. 7 U.S.C. § 518d(c)(2). As set forth in the statute,

> The amount of the assessment for each class of tobacco product specified in subsection [Step B] to be paid by each manufacturer or importer of that class of tobacco product shall be determined for each quarterly payment period by multiplying-- (1) the market share of the manufacturer or importer, as calculated with respect to that payment period, of the class of tobacco product; by (2) the total amount of the assessment for that quarterly payment period under subsection (c), for the class of tobacco product.

7 U.S.C. § 518d(f). Therefore, once the class allocations were calculated, each individual tobacco manufacturer's assessment was based on its pro rata share of gross domestic volume within that class. 7 U.S.C. § 518d(e)(1).[2] The USDA based the Step B calculation on the volume "removed" from a tobacco manufacturer's inventory and entered into the domestic commercial market. As such, FETRA required that tobacco manufacturers report the volume of tobacco products "removed" and the taxes paid on those cigarettes.[3] 7 U.S.C. § 518d(h). If a tobacco

---

[2] As set out in the Soto Declaration a typical calculation would work as follows:
> Assume that the cost for a fiscal year quarter of the [Tobacco Transition Payment Program] was $10 million, and assume that cigarette manufacturers would, as a class [have] to pay 75% of that amount, or $7.5 million. If a particular cigarette manufacturer had 50% of domestic sales within the cigarette class, then the manufacturer would owe $3.75 million (50% of $7.5 million). In this example, 75% would be the Step A percentage for cigarettes as a class, and 50% would be the Step B determination.

Soto Declaration, at ¶ 2.

[3] As defined by the statute,
> "Removal" or "remove" means the removal of tobacco products or cigarette papers or tubes, or any processed tobacco, from the factory or from internal revenue bond under section 5704, as the Secretary shall by regulation prescribe, or release from customs

manufacturer failed to provide the information to the USDA, the assessment was based on the annual excise tax data on that manufacturer.

The statute provides that the FETRA assessments were "collected at the end of each calendar year quarter."[4] 7 U.S.C. § 518d(d)(3). The collection dates for the assessments were March 30, June 30, September 30, and December 30. *See also* Soto Declaration at ¶7. At least 30 days before the collection the manufacturer was given notice of the amount of the assessment as set out in 7 U.S.C. § 518d(d)(1).

As a cigarette and cigar manufacturer, the Debtor was subject to the FETRA assessments. The Debtor made payments on the FETRA assessments through September 1, 2008 and made a partial payment for the December 2008 assessment. Starting in March 2009, the Debtor failed to make any payments on its accruing FETRA assessments. Between 2008 and 2011, the USDA and the Debtor entered into four different promissory notes to pay off prior assessments. The final consolidated promissory note, signed in September 2011, covered all prior assessments due and owing. The USDA continued to issue FETRA assessments through December 2014. The Debtor failed to comply with the terms of the note, and its last partial payment was made in 2012. On May 8, 2014, the USDA accelerated the note and demanded full payment. The following table sets out the unpaid FETRA assessments allocated to the Debtor.

custody, and shall also include the smuggling or other unlawful importation of such articles into the United States.

26 U.S.C. § 5702. The definition broadly covers any movement of a tobacco product from a manufacturer, importer, or smuggler to market to be sold to consumers.

[4] For example, the assessment invoice for March 2010 covered the tobacco products removed from October 1-December 31, 2009. *See* Exhibit B. in Docket No. 300.

-6-

Table 1. The FETRA assessments imposed on the Debtor[5]

| Invoice Date | Transaction Months | Cigarettes | Cigars | Roll Your Own | Total |
|---|---|---|---|---|---|
| Mar. 2009 | Oct. 1-Dec. 31, 2008 | $241,225.40 | $1,528.02 | $51.67 | $242,805.09 |
| Jun. 2009 | Jan. 1-Mar. 31, 2009 | $251,134.17 | $6,660.61 | $71.77 | $257,866.55 |
| Sep. 2009 | Apr. 1-Jun. 30, 2009 | $222,778.74 | $0.00 | $0.00 | $222,778.74 |
| Dec. 2009 | Jul. 1-Sep. 30, 2009 | $221,291.20 | $0.00 | $0.00 | $221,291.20 |
| Mar. 2010 | Oct. 1-Dec. 31, 2009 | $207,904.06 | $0.00 | $0.00 | $207,904.06 |
| Jun. 2010 | Jan. 1-Mar. 31, 2010 | $195,216.96 | $0.00 | $0.00 | $195,216.96 |
| Sep. 2010 | Apr. 1-Jun. 30, 2010 | $188,018.54 | $0.00 | $0.00 | $188,018.54 |
| Dec. 2010 | Jul. 1-Sep. 30, 2010 | $173,826.19 | $0.00 | $0.00 | $173,826.19 |
| Mar. 2011 | Oct. 1-Dec. 31, 2010 | $156,938.19 | $0.00 | $0.00 | $156,938.19 |
| Jun. 2011 | Jan. 1-Mar. 31, 2011 | $157,609.72 | $8,727.31 | $0.00 | $166,337.03 |
| Sep. 2011 | Apr. 1-Jun. 30, 2011 | $146,175.51 | $1,544.39 | $0.00 | $147,719.90 |
| Dec. 2011 | Jul. 1-Sep. 30, 2011 | $143,475.04 | $9,888.92 | $0.00 | $153,363.96 |
| Mar. 2012 | Oct. 1-Dec. 31, 2011 | $131,785.61 | $21,918.50 | $0.00 | $153,704.11 |
| Jun. 2012 | Jan. 1-Mar. 31, 2012 | $124,329.65 | $23,009.25 | $0.00 | $147,338.90 |
| Sep. 2012 | Apr. 1-Jun. 30, 2012 | $116,001.00 | $16,740.19 | $0.00 | $132,741.19 |
| Dec. 2012 | Jul. 1-Sep. 30, 2012 | $115,756.94 | $23,608.88 | $0.00 | $139,365.82 |
| Mar. 2013 | Oct. 1-Dec. 31, 2012 | $115,924.86 | $23,650.38 | $0.00 | $139,575.24 |
| Jun. 2013 | Jan. 1-Mar. 31, 2013 | $119,075.75 | $15,648.89 | $0.00 | $134,724.64 |
| Sep. 2013 | Apr. 1-Jun. 30, 2013 | $105,555.49 | $17,975.61 | $0.00 | $123,531.10 |
| Dec. 2013 | Jul. 1-Sep. 30, 2013 | $112,262.18 | $85,794.28 | $0.00 | $198,056.46 |
| Mar. 2014 | Oct. 1-Dec. 31, 2013 | $96,704.96 | $194,275.43 | $0.00 | $290,980.39 |
| Jun. 2014 | Jan. 1-Mar. 31, 2014 | $96,702.92 | $198,477.32 | $0.00 | $295,180.24 |
| Sep. 2014 | Apr. 1-Jun. 30, 2014 | $69,728.29 | $197,538.25 | $0.00 | $267,266.54 |
| Dec. 2014 | Jul. 1-Sep. 30, 2014 | $74,761.93 | $197,538.25 | $0.00 | $272,300.18 |
| Total Assessed: | | $3,584,183.30 | $1,044,524.48 | $123.44 | $4,628,831.22 |

The Debtor filed a voluntary petition for chapter 11 bankruptcy relief on September 16, 2016. *See* Docket No. 1. The USDA's amended proof of claim seeks priority treatment under 11 U.S.C. § 507(a)(8)(E) in the amount of $4,717,090.84 for the unpaid FETRA assessments and

---

[5] Table 1 was compiled using Exhibit B from USDA's proof of claim, which was attached to the Debtor's Motion for Summary Judgement at Docket No. 300.

accrued interest.[6] The accrued interest is itemized through March 31, 2015 in the detail history of the account maintained by the USDA and attached to the proof of claim.[7]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to a material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The purpose of summary judgment is to streamline litigation and avoid unnecessary cost at trial. *Mitchell v. Zia Park, LLC*, 842 F. Supp. 2d 1316, 1321 (D.N.M. 2012)("Principal purposes of summary judgment include streamlining litigation and saving needless time and expense by isolating and disposing of purely legal issues and factually unsupported claims and defenses."); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("Summary judgment procedure is properly regarded . . . as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and . . . demonstrat[ing] the absence of a genuine issue of material fact." *Id.* at 323.

The non-moving party "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). The non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, (1986). In determining summary judgment, the Court construes all facts and reasonable inferences in the

---

[6] The USDA's proof of claim includes interest that is not reflected in Table 1, which was compiled based on the issued quarterly assessment invoices.
[7] The Court is unable to calculate the amount of the accrued interest based on the documentation provided in the amended proof of claim.

light most favorable to the non-moving party. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) ("we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."). The Court "asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 252.

DISCUSSION

The Debtor objects to the USDA's proof of claim, arguing that the FETRA assessments are not entitled to priority treatment under § 507(a)(8)(E) because: (1) the FETRA assessments are regulatory fees, not excise taxes; (2) if the FETRA assessments are not regulatory fees they should be treated as customs duties for assigning priority because they apply to both tobacco importers and tobacco manufacturers; and (3) under § 507(a)(8)(E) only to those taxes assessed within three years of the petition date are given priority status, thereby excluding the September 2013 assessment. In their cross motion for summary judgment response, the USDA maintains that (1) the FETRA assessments are excise taxes; and (2) admits that the USDA's priority claim is limited to those assessments arising within three-years of the Debtor's petition date as prescribed by § 507(a)(8)(E).

Section 507(a) governs whether claims are granted priority status and the order of payment of priority claims. Subsection (8) of § 507(a) governs priority claims of governmental units. It applies to custom duties as well as various types of taxes, including income taxes, gross receipts taxes, property taxes, employment taxes, and excise taxes. 11 U.S.C § 507(a)(8). The principal issue before the Court is whether the FETRA assessments are excise taxes entitled to priority under § 507(a)(8)(E). Section 507(a)(8)(E) provides, in relevant part:

-9-

(a) The following expenses and claims have priority in the following order: . . . (8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for-- . . . (E) an excise tax on-- (i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or (ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition.

11 U.S.C. § 507(a)(8)(E).

A.  Are FETRA assessments "excise taxes" under 11 U.S.C. § 507(a)(8)(E)?

The Code does not provide a definition of "tax" or "excise tax." *See* 11 U.S.C. § 101; *see also United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 220 (1996) ("The Bankruptcy Code itself provides no definition of "excise," "tax," or "excise tax.""). Instead, the definitions of these terms have developed through case law. *Id.*

In *Meriwether v. Garrett*, the Supreme Court stated that taxation is the "power to impose burdens and raise money . . . and is exercised, first, to raise money for public purposes only; and, second, by the power of legislative authority only." 102 U.S. 472, 516 (1880). Following the adoption of the Bankruptcy Act of 1898 the Supreme Court stated that "the priority commanded by [a section of the Bankruptcy Act of 1898 that preceded § 547(a)(8)(E) of the Bankruptcy Code] extends to those pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *City of New York v. Feiring*, 313 U.S. 283, 285 (1941); *see also In re Farmers Frozen Food Co*. 221 F. Supp. 385, 387 (N.D. Cal. 1963), aff'd sub nom; *Dungan v. Dep't of Agric., State of Cal*., 332 F.2d 793 (9th Cir. 1964). The Supreme Court reaffirmed the *Feiring* line of cases in *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, and held that to determine whether an exaction was entitled to priority under the Code requires a "functional examination" of "the actual effects of the exactions." 518 U.S. 213, 221 (1996).

-10-

*1. The Chateaugay/Lorber test*

The Tenth Circuit Court of Appeals adopted a test hereafter called the

*Chateaugay/Lorber* test[8] as the means to perform the functional examination to determine

whether an "exaction" is treated as a tax in bankruptcy cases in situations where the Code does

not expressly state whether the exaction is a tax. Under the *Chateaugay/Lorber* test,

> If the contributions are:
> 1. An involuntary pecuniary burden, regardless of name, laid upon the individuals or property;
> 2. Imposed by, or under authority of the legislature;
> 3. For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;
> 4. Under the police or taxing power of the state;
> [then] the contributions have the functionality of a tax and claims for those contributions are entitled to tax priority.

*In re CF & I Fabricators of Utah, Inc.,* 150 F.3d 1293, 1298 (10th Cir. 1998).[9] Although the

Supreme Court has had the opportunity to review the *Chateaugay/Lorber* test, it has neither

adopted nor overruled its application. *See United States v. Reorganized CF & I Fabricators of*

*Utah, Inc.*, 518 U.S. 213, 221 (1996).

In applying the *Chateaugay/Lorber* test, the Court is guided by the Supreme Court's

mandate that any doubt concerning the appropriate characterization of a debt as a tax or a fee

---

[8] This Court defines the test as the Chateaugay/*Lorber* test in recognition of the Tenth Circuit's reference to the test in *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1293, 1298 (10th Cir. 1998) as the Chateaugay test and other case law referring to it as the *Lorber* test. The Ninth Circuit adopted the test in *In re Lorber Indus. of California, Inc.*, 675 F.2d 1062, 1066 (9th Cir. 1982). The Second Circuit adopted the same test in *In re Chateaugay Corp*., 53 F.3d 478, 498 (2d Cir. 1995). The Sixth Circuit has followed the Fourth Circuit in refining the *Chateaugay/Lorber* test with the additional criteria of: "(1) that the pecuniary obligation be universally applicable to similarly situated entities; and (2) that according priority treatment to the government claim not disadvantage private creditors with like claims." *In re Suburban Motor Freight, Inc.*, 36 F.3d 484, 488 (6th Cir. 1994); *see Boston Reg'l Med. Ctr., Inc. v. Massachusetts Div. of Health Care Fin. & Policy*, 365 F.3d 51, 59 (1st Cir. 2004) (applying the *Suburban Motor* approach); *In re Camilli*, 94 F.3d 1330, 1334 (9th Cir. 1996) (examining *Suburban Motor* and discussing the concern that the "public purpose" element of the original Lorber test is overbroad.). The Tenth Circuit has not adopted or considered the *Suburban Motor* refinements to the *Chateaugay/Lorber* test.

[9] *Accord In re Sunnyside Coal Co.*, 146 F.3d 1273, 1276-77 (10th Cir. 1998).

should be resolved in accordance with the Code's objective to "secur[e] equal distribution among creditors . . . and [the] corollary principle that preference provisions must be tightly construed." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 653 (2006) (examining a priority under § 503(a)(5)); *see In re Cassidy*, 983 F.2d 161 (10th Cir. 1992)(applying the *Chateaugay/Lorber* test to determine if an exaction was properly characterized as a penalty or as a tax under §507(a)(7);[10] *see also In re Lorber Indus. of California*, 564 F.3d 1098, 1100–01 (9th Cir. 2009); *In re Albion Health Servs.*, 360 B.R. 599, 604 (B.A.P. 6th Cir. 2007).

The Court looks behind the labels used in the statute and instead applies a "functional analysis" to determine whether a debt is a tax. *See CF & I Fabricators of Utah, Inc.,* 518 U.S. at 221 (holding the court places no weight on the "tax" label and instead considers the actual effects of the exactions); *In re Sunnyside Coal Co.*, 146 F.3d 1273, 1276-77 (10th Cir. 1998) (holding the court is to apply a functional analysis); *In re Cassidy*, 983 F.2d 161, 163 (10th Cir. 1992) ("The labeling of an exaction as a tax by Congress is not determinative.").

2.  *Applying the Chateaugay/Lorber test*

With these principles in mind, the Court reviews each element of the *Chateaugay/Lorber* test separately.

a.  <u>*Involuntary pecuniary burdens*</u>

For the FETRA assessments to function as a tax, the first element of the *Chateaugay/Lorber* test requires the Court to determine whether the FETRA assessments are an involuntary pecuniary burden. Under FETRA, Congress imposed assessments on tobacco manufacturers and tobacco importers. On the one hand, the assessments are involuntary pecuniary burdens because all tobacco manufacturers were required to pay the assessments. On

_____

[10] Although the Tenth Circuit in *Cassidy* applied the *Chateaugay/Lorber* test, the test was not so labelled in *Cassidy*.

the other hand, the assessments were voluntary because no company was required to manufacture or import tobacco.[11]

When applying the *Chateaugay/Lorber* test, courts have reached different results regarding whether a pecuniary burden is voluntary or involuntary. For example, the Bankruptcy Appellate Panel for the Eighth Circuit found that an assessment levied against "those who choose to own and operate heavy trucks on the highways and drive at least 5,000 miles annually" was an involuntary pecuniary burden because it was "imposed on every large vehicle that fits within the parameters of Section 4481 of the Internal Revenue Code." *In re Trism, Inc.*, 311 B.R. 509, 514–15 (B.A.P. 8th Cir. 2004), *aff'd,* 126 F. App'x 339 (8th Cir. 2005). Essentially, the Eighth Circuit BAP reasoned that because all drivers who choose to drive heavy trucks on the highway uniformly were required to pay the assessment it was an involuntary burden.

In contrast, when determining if industrial wastewater fees that varied with the amount of discharge were an involuntary pecuniary burden, the Ninth Circuit held that because the fees only applied to industrial users who chose to discharge wastewater in the City's sewage system, the burden was voluntary. *In re Lorber Indus. of California, Inc.*, 675 F.2d 1062, 1064-1067 (9th Cir. 1982). The Ninth Circuit came to this conclusion even though no practical alternatives for industrial users were available. The Ninth Circuit reasoned that the burden was voluntary because "the source of the obligation is not the authorizing legislation, but [an industrial users']

---

[11] The Debtor executed promissory notes to pay past due assessments over time. The Debtor's execution of the promissory notes was involuntary in the sense that its refusal to sign the notes would have resulted in the government taking immediate collection action against the Debtor. On the other hand, execution of the notes was voluntary in the sense that a company that could pay the past due amounts or that was willing to suffer the consequences of immediate action on the part of the government to collect the past due amounts need not sign a note. As discussed below, the assessments covered by the promissory notes the Debtor executed are all outside of the 3-year time frame entitled to priority under § 507 (a)(8)(E). Therefore, the Court need not decide whether execution of or payment under the promissory notes was voluntary or involuntary.

-13-

decisions to acquire a permit and to engage in a high level of system use." *In re Lorber*, 675 F.2d at 1067.[12]

In *In re Sunnyside Coal*, the Tenth Circuit examined government mandated employer premiums to fund benefits for retired coals workers and found that the premiums were involuntary pecuniary burdens. The court reasoned that the premiums were involuntary because they were: (1) not for a service the government provided to the companies who were engaged in mining coal; (2) assessed on the entire coal industry; and (3) required if a company engaged in the business of mining coal. *In re Sunnyside Coal Co.*, 146 F.3d at 1275-77.

Applying the reasoning of *Sunnyside Coal*, this Court concludes that the FETRA assessments are an involuntary pecuniary burden because the assessments were: (1) not for a service the government provides or provided to tobacco manufacturers; (2) imposed on the entire industry; and (3) required if a company engaged in the business of manufacturing or importing tobacco products. *See* 150 Cong. Rec. H8710 ("The tobacco companies now have to step up and put the money up to do this so that the growers and farmers are not penalized anymore in the tobacco business.").

In addition, tobacco manufacturers and tobacco importers have not regarded the FETRA assessments as voluntary in as much as they have litigated the constitutionality of the assessments, challenged the USDA's rule promulgation pursuant to FETRA, refused to pay the assessments, and tried to get the assessments discharged in bankruptcy. *See Swisher Int'l, Inc. v. Johanns*, 2007 WL 4200816, at *3 (M.D. Fla. Nov. 27, 2007), *aff'd sub nom. Swisher Int'l, Inc.*

---

[12] An easier case is one where a company buys products or services from a governmental unit that it is not required by law to buy and as a practical matter has an alternative source of supply. For example, in *In re S. Atl. Packers Ass'n, Inc.*, 28 B.R. 80, 81-82 (Bankr. D.S.C. 1983) the court held that a state agency's charges for poultry grading services was a voluntary pecuniary burden because poultry producers were not required by law to purchase the service.

-14-

*v. Schafer*, 550 F.3d 1046 (11th Cir. 2008); *United States v. Leader Tobacco Co.*, 2010 WL 3701581, at *2 (S.D. Fla. Sept. 15, 2010); *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 682 (D.C. Cir. 2010); *United States v. NISE USA, LLC*, 2011 WL 4578335, at *1 (D. Ariz. Oct. 4, 2011); *In re Int'l Tobacco Partners, Ltd.*, 468 B.R. 582, 585 (Bankr. E.D.N.Y. 2012).

The first element of the *Chateaugay/Lorber* test is satisfied.

      b.   <u>Imposed by or under authority of the legislature</u>

The second element of the *Chateaugay/Lorber* test requires the Court to determine whether the FETRA assessments were imposed by or under the authority of the legislature. This element is not in dispute. The FETRA assessments are imposed pursuant to an act of the United States Congress. 7 U.S.C. § 518d. The Department of Agriculture adopted regulations to calculate and collect the FETRA assessments. 7 C.F.R. §§ 1463.1-1463.201. The Court concludes that the FETRA assessments were imposed by or under the authority of the legislature. The second element of the *Chateaugay/Lorber* test is satisfied.

      c.   <u>For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it</u>

The third element of the *Chateaugay/Lorber* test requires the Court to determine whether the FETRA assessments were imposed "for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it." *In re CF & I Fabricators of Utah, Inc.,* 150 F.3d at 1298.

The Debtor argues that the FETRA assessments do not serve a public purpose and are therefore regulatory fees because the purpose of the FETRA assessments was to deregulate tobacco production and benefit private parties (tobacco farmers), not to raise revenue for the purpose of defraying expenses of government. The USDA counters that the FETRA assessments serve a public purpose because the assessments (a) defray the cost to the government of

-15-

deregulation of the tobacco industry through elimination of subsidies; (b) help tobacco farmers transition off subsidies, which benefits not only the tobacco farmers but also the communities where they live; (c) transition the tobacco industry to a free market system, which ultimately creates a healthier industry; (d) were not imposed to pay for services given to tobacco manufacturers; and (e) are not a part of a regulatory system.

i.    The public purposes element

The "public purposes" element of the *Chateaugay/Lorber* test is the element most often in dispute and the most difficult to apply. Arguably every law enacted by the legislature serves at least some public purpose. Consequently, if every statute has a public purpose then arguably the "public purposes" element would be satisfied in every case. Such a broad reading would render the element superfluous. *See In re Sunnyside Coal Co*., 146 F.3d 1273, 1280 (10th Cir. 1998) (dissenting opinion) ("If one defines a tax as a pecuniary burden laid upon individuals or property 'for public purposes,' any state-mandated obligation becomes a 'tax.'").

There are at least two factors that limit the type of purpose that qualifies as "public" under the *Chateaugay/Lorber* test. First, a punitive public purpose does not satisfy the public purposes element of the test even if it also results in enforcing compliance with laws. The Supreme Court in *Reorganized CF & I Fabricators of Utah, Inc*. distinguished a "tax" from a "penalty" explaining, "[a] tax is an enforced contribution to provide for the support of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act." 518 U.S. 213, at 224 (quoting *United States v. La Franca*, 282 U.S. 568, 572, (1931)).[13]

_____

[13] Under § 507(a)(8)(G) of the Code, a penalty related to a claim of a kind specified in this paragraph [which includes § 507(a)(8)(E)] and in compensation for actual pecuniary loss" is granted priority status. Because a penalty is given a different priority status, this suggests a penalty is not an excise tax under § 507(a)(8)(E).

-16-

Second, the Court should look to the legislature's principal purpose or purposes in imposing the assessment even if there are other incidental purposes.[14] If the principal purpose of the assessment is: (a) to pay for a benefit provided to the private party payer of the assessment; or (b) to enforce a private obligation, then the assessment is not entitled to a priority under § 507(a)(8)(E). This limitation on what qualifies as a "public purpose" under the *Chateaugay/Lorber* test is consistent with the Tenth Circuit's analysis in *In re Cassidy*, 983 F.2d 161, 163 (10th Cir. 1992) and *In re CF & I Fabricators of Utah, Inc*., 150 F.3d 1293, 1298 (10th Cir. 1998) and is supported by case law in other circuits.[15]

In *In re Cassidy*, the Tenth Circuit addressed whether an IRS imposition of a 10% exaction on the premature withdrawal of pension plan funds is an excise tax or a penalty. 983 F.2d at 163. The Court observed that the legislative history of the exaction revealed multiple purposes including: (a) to promote retirement savings; (b) to recapture a measure of tax benefits that have been provided prior to the withdrawal; and (c) to deter the use of retirement funds for nonretirement purposes. *Id.* at 164. After determining the arguments in favor of each purpose were equal, the Tenth Circuit ruled that the exaction was a penalty that did not compensate for

---

[14] Under the Tax Injunction Act, 28 U.S.C. § 1341, to which the *Chateaugay/Lorber* test does not apply, fees that a public agency charges to issue a permit to practice law or medicine or construct a house or run a broadcast station are not considered to be a tax. *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340–41 (1974). In addition, fees assessed for regulatory or punitive purposes, even though they may also raise revenues and fees expressly tied to the administrative costs of a specific regulatory scheme, are generally not considered to be a tax under the Tax Injunction Act. *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 761-62 (10th Cir. 2010); *Marcus v. Kansas Dep't of Revenue*, 170 F.3d 1305, 1311-12 (10th Cir. 1999).

[15] Various courts applying the public purposes element of the *Chateaugay/Lorber* test have been guided by the principal purpose of the statute. *See e.g., In re Belozer Farms, Inc*., 199 B.R. 720, 726-27 (B.A.P. 9th Cir. 1996) (explaining the public purposes element is satisfied if the assessments inure primarily to the general public welfare rather than the payer); *In re Gardens Regional Hospital and Medical Center, Inc.*, 573 B.R. 811, 816 (Bankr. C.D. Cal. 2017), *aff'd*, No. BR 2:16-17463 ER, 2018 WL 2213449 (C.D. Cal. May 11, 2018) (determining whether exactions serve a public purpose requires the Court to assess whether the private party payer or the public at large receives the preponderance of the benefits under the legislation); *In re S.N.A. Nut Co.*, 188 B.R. 392, 394 (Bankr. N.D. Ill. 1995) (explaining assessments are fees and not taxes when the resulting funds are used for the primary benefit of the payer).

actual pecuniary loss and therefore was a not entitled to priority status. *Id.* at 164-66; *see also In re Chesteen*, 2018 WL 878847, at *1 (Bankr. E.D. La. Feb. 9, 2018) (determining whether an assessment is a tax or penalty, requires the court to decide whether the primary or dominate purpose is to support the government or to punish or discourage certain conduct).

In *In re CF & I Fabricators of Utah, Inc*, the Tenth Circuit examined whether the Pension Benefit Guaranty Corporation's ("PBGC's") claims for the debtor's unpaid minimum contributions and unfunded benefit liabilities were taxes and therefore entitled to priority status. 150 F.3d at 1296. The PBGC is a wholly-owned corporation of the United States "that protects the pension benefits of private-sector American workers who participate in ERISA-covered pension plans" and is funded "primarily by employers that maintain ongoing pension plans."[16] After noting that the "PBGC admits the contributions are directed to and for the protection of individual benefit plans," the Tenth Circuit concluded that

> the object of the contributions is not to defray the expenses of the government or any governmental undertaking, but rather, is to finance a private obligation. Although mandated by statute, there is simply no credible argument that the required payments fund either a function of the United States or any of its undertakings. It thus follows PBGC's claim for unpaid minimum contributions is not to be accorded tax priority.

*Id*. at 1298. The Tenth Circuit reached this conclusion even though ERISA arguably serves a public purpose and is backed by the federal treasury. *See In re Bayly Corp.*, 163 F.3d 1205, 1208

---

[16] *Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 331–32 (4th Cir. 2007). Employer funding of the PBGC consists of annual premiums paid by employers and a statutory liability imposed on employers who terminate under-funded pension plans. *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 638, 110 S. Ct. 2668, 2671–72, 110 L. Ed. 2d 579 (1990). "Nevertheless, as PBGC is the governmental backstop for failed pension plans, a taxpayer bailout would be another source of funding if PBGC were otherwise unable to fulfill its mission. In fact, PBGC is already confronting a $23 billion deficit and is currently paying pension benefits to one million individuals while also insuring the pensions of some forty-four million other individuals; thus, the specter of a future bailout looms." *In re UAL Corp.*, 428 F.3d 677, 680 (7th Cir. 2005). Under ERISA, an "employer's choice to initiate such a pension plan is totally voluntary; however, once that plan is established, the employer must meet the minimum funding standards prescribed in the Internal Revenue Code . . . and ERISA." *In re CF & I Fabricators of Utah, Inc*, 150 F.3d 1293, 1295 (10th Cir. 1998).

-18-

(10th Cir. 1998) ("ERISA contributions under 29 U.S.C. § 1362 serve a public purpose because their purpose is to support the government in its effort to maintain pension stability."); *In re UAL Corp.*, 428 F.3d 677, 680 (7th Cir. 2005) ("a taxpayer bailout would be another source of funding if the PBGC were otherwise unable to fulfill its mission."). As such, the Tenth Circuit could have found that the statute serves a public purpose to support the government in its effort to maintain pension stability and to avoid a taxpayer bailout of ERISA pension plans. Instead, the Tenth Circuit found the purpose of the statute was to finance a private obligation.

In contrast, in *Sunnyside Coal* the Tenth Circuit held that payments by a coal company under the Coal Act to fund pension plans for retirees satisfied the public purposes element of the *Chateaugay/Lorber* test because "the evident objective of the Coal Act was the preservation of the nation's coal industry by promoting labor peace through the protection of health benefits for those employees of companies that discontinued operations." *Id.* at 1277 (internal quotations omitted). The *Sunnyside Coal* court did not characterize the purpose of the statute as providing a private benefit to coal industry employees even though that was one of the purposes of the statute. The Tenth Circuit explained that although it was "imprecise" to call stabilization a public purpose, "it is neither misleading nor difficult in the context of the limited inquiry we perform." *Id.*

The Tenth Circuit has acknowledged that the holdings of *CF & I Fabricators* and *Sunnyside Coal* are in tension. In *In re Bayly Corp* the Tenth Circuit explained,

> Arguably, if Coal Act contributions serve a public purpose because their "purpose is to support the government in its effort to maintain stability in the coal industry," then ERISA contributions under 29 U.S.C. § 1362 serve a public purpose because their purpose is to support the government in its effort to maintain pension stability. Contributions under 29 U.S.C. § 1362 support the government in its pension stabilization undertaking by defraying expenses of the government . . . On the other hand, we note that in *In re CF & I Fabricators of Utah, Inc.* this court held that PBGC's claim for unpaid minimum funding contributions under 26 U.S.C. §

-19-

> 412(n)(1)(B) did not qualify as a tax under the Bankruptcy Code because the contributions served no public purpose.

*In re Bayly Corp.*, 163 F.3d 1205, 1208, n. 4 (10th Cir. 1998) (internal citations omitted). *CF & I Fabricators* and *Sunnyside Coal* can be reconciled by determining whether an assessment serves principally public purposes rather than incidental private purposes. Therefore, in applying the public purposes element, the Court will look at the principal purposes of imposing the FETRA assessments.

    ii.    <u>Applying the public purposes element</u>

The Court will now examine the purposes of the FETRA assessments. The Court believes that Congress had multiple purposes in adopting FETRA and imposing the assessments. Therefore, it is necessary to determine the principal purposes and consider whether those purposes are public or private purposes.

First, the Court notes that the purpose of the FETRA assessments was not to penalize. In enacting the FETRA assessments, Congress did not impose the assessments to penalize unlawful acts or deter unlawful behavior.

The principal purpose of FETRA was to stabilize the tobacco industry by transitioning the industry to a free market in which American tobacco leaf would be more competitive on the world market. The purpose of the TTPP payments by the USDA to tobacco farmers was to enable farmers to transition, without financial ruin, to a free market system without the quotas and subsidies upon which they had come to rely.[17] FETRA eliminated the prior quotas and subsidies. The purpose of the FETRA assessments imposed on tobacco manufacturers and

---

[17] *See Swisher Int'l, Inc. v. Johanns*, No. 3:05-CV-871-J16-TEM, 2007 WL 4200816, at *10 (M.D. Fla. Nov. 27, 2007), *aff'd sub nom. Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046 (11th Cir. 2008) (without protection for the tobacco farmers that could have been a "difficult and potentially financially ruinous transition to the free market.").

importers was to defray the cost to the government of the TTPP payments to tobacco farmers.

This Court agrees with *In re Int'l Tobacco Partners, Ltd.* holding that the public purposes of the

FETRA assessments were

> (1) stabilizing U.S. Tobacco Growers and the tobacco industry as a whole during the ten-year period of transition from a heavily regulated industry to a free market; (2) enabling U.S. Tobacco Growers that opt not to complete in the free market to grow other products or find alternative jobs; (3) making the tobacco industry as a whole more competitive and less dependent on government subsidies and controls; and (4) defraying the expenses of the Tobacco Transition Payment Program through the Assessments.

468 B.R. 582, 597 (Bankr. E.D.N.Y. 2012).

The Court acknowledges that the FETRA assessments may have benefitted private

parties, namely tobacco farmers through the TTPP payments. FETRA presented tobacco farmers

with a tradeoff. On the one hand, eliminating the quotas and price supports resulted in decreased

prices for tobacco and no government subsidies. On the other hand, eligible farmers received

TTPP payments. Overall, tobacco farmers had to adjust to the free market, grow other crops, or

find alternative work. However, this the potential benefit to the tobacco farmers was not the

principal purpose of FETRA or the FETRA assessments.

Further, FETRA did not create or enforce a private obligation between individual tobacco

manufacturers and tobacco farmers. As such FETRA is unlike the scheme at issue in *CF & I*

*Fabricators*, in which the premiums at issue were the result of a negotiated private obligation

between the company and its employees for which the government acted as an intermediary and

backstop to ensure that employers complied with their agreements. *See* 150 F.3d at 1298

(explaining that ERISA ensured that employers paid minimum contributions to their qualified

pension plans to fund retirement benefits for their employees.).

In addition, unlike a traditional regulatory fee, the FETRA assessments did not constitute

payment for a service that benefited tobacco manufacturers. *See United States v. River Coal Co.*,

748 F.2d 1103, 1106 (6th Cir. 1984) ("A fee, however, is incident to a voluntary act, *e.g.,* a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing these services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society.").

The Court holds that the principal purposes of the FETRA assessments are public. Because FETRA's principal purposes are public purposes, the third element of the *Chateaugay/Lorber* test is satisfied.

### d. <u>Under the police or taxing power of the state</u>

The fourth and final element of the *Chateaugay/Lorber* test requires the Court to determine whether the FETRA assessments were imposed under the police or taxing power of the state. The Debtor argues that because Congress gave the Department of Agriculture, and not the Department of the Treasury, the authority to promulgate rules and collect the FETRA assessments, the assessments were not made under the police or taxing powers. The court agrees with the Debtor that the FETRA assessments were not imposed under a police power. That is of little consolation to the Debtor, however, because the Court also concludes that the FETRA assessments were imposed under the taxing power of the federal government.

The FETRA assessments were not imposed under a police power. The United States Constitution delegates and enumerates the limited powers of the federal government. *See* U.S. Const. amend. X. The Tenth Amendment reserves for the states "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X. The general power of governing, or the police power, is therefore left to the States. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) ("Our cases refer to this general power of governing, possessed by the States but not by the Federal Government, as the 'police power.'");

-22-

*United States v. Morrison*, 529 U.S. 598, 618, (2000) ("the police power, which the Founders denied the National Government and reposed in the States"). Because the FETRA assessments were enacted by the federal government, they cannot be the result of an exercise of policy power reserved to the states.

The FETRA assessments, however, were imposed under the taxing power of the federal government. The taxing power is an enumerated power of Congress in Article I, Section 8 of the United States Constitution. U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises . . ."). The Supreme Court has described the taxing power as

> limited to requiring an individual to pay money into the Federal Treasury, no more. If a tax is properly paid, the Government has no power to compel or punish individuals subject to it. We do not make light of the severe burden that taxation— especially taxation motivated by a regulatory purpose—can impose. But imposition of a tax nonetheless leaves an individual with a lawful choice to do or not do a certain act, so long as he is willing to pay a tax levied on that choice.

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 574 (2012).

The FETRA assessments were passed as a part of a tax act entitled the American Jobs Creation Act of 2004. Although passed by Congress as a part of a tax act, FETRA amended Title 7, and the authority to regulate under the statute was given to the Secretary of Agriculture. *See* 7 U.S.C. § 518. The Debtor argues that because FETRA did not amend the Internal Revenue Code, Title 26, and was not overseen by the Secretary of the Treasury, it should not be considered a tax. The Court disagrees. Whether Congress chose to place the authority to collect the assessments from tobacco manufacturers within the Internal Revenue Code or in Title 7 is a formal distinction that does not change the functional analysis of the Court. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, at 221 (1996) (" . . . in every one of those cases the Court looked behind the label placed on the exaction and rested its answer

-23-

directly on the operation of the provision using the term in question."). The FETRA assessments required tobacco manufacturers and tobacco producers to pay money into the Tobacco Trust Fund, which is a fund within the Commodity Credit Corporation, and backed by the Federal Treasury. 7 U.S.C. § 518d; 15 U.S.C. § 714. The formal choice of the fund in which FETRA assessments are deposited does not place the assessments outside the taxing power of the federal government.

The fourth and final element of the *Chateaugay/Lorber* is satisfied.

B. FETRA assessments are properly characterized as excise taxes not customs duties.

In the alternative, the Debtor argues that if the Court does not find the FETRA assessments are regulatory fees then the Court should characterize the FETRA assessments as "customs duties" rather than "excise taxes" because FETRA imposes assessments both on tobacco importers and domestic tobacco manufacturers. Subsections (E) and (F) of § 507(a)(8) differentiate between excise taxes and customs duties and assign a higher priority to claims under subsection (E). The Debtor argues that that the Court should assign the FETRA assessments the lower priority status of customs duties under 11 U.S.C. § 507(a)(8)(F). The Debtor asserts that the policy of tightly construing priorities mandates that the FETRA assessments be characterized as customs duties and therefore assigned to § 507(a)(8)(F), so as not to "reduce the funds available to general unsecured creditors." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006).

A customs duty is a subcategory of taxes imposed "on the commercial privilege of bringing goods into a country." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 287, (1976). Because the Debtor was not in the business of importing tobacco, the Court concludes that as applied to the Debtor the FETRA assessments were excise taxes and not customs duties.

-24-

FETRA's inclusion of tobacco importers does not render the FETRA assessment on domestic tobacco manufactures a customs duty.

"[C]ustoms duty" is not defined in the Code. 11 U.S.C. § 101. The Supreme Court has characterized an impost or customs duty as a subcategory of taxes "on the commercial privilege of bringing goods into a country." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 287, (1976). Black's Law Dictionary defines a "customs duty" as "a tax levied on an imported or exported commodity; esp., the federal tax levied on goods shipped into the United States." Duty, Black's Law Dictionary (10th ed. 2014). For an assessment to be a custom duty under 11 U.S.C. § 507(a)(8)(F), the duty must "provide revenue from imports." *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 361, (1998). The Debtor has never imported tobacco. It has never been involved in the commercial enterprise of bringing goods into the country.

The Debtor cites *Michelin Tire Corp. v. Wages* for the proposition that a tax can be duty even if it is "levied upon the goods as imports after entry." 423 U.S. 276, 296 (1976). The Debtor argues that this proposition means the FETRA assessments should be characterized as duties even when applied to domestic tobacco manufacturers because the FETRA statute applies the assessments uniformly to both manufacturers and importers. The Court is not persuaded by the Debtor's argument.

In *Michelin Tire Corp.*, the Supreme Court held that a non-discriminatory state tax did not violate the Constitution's Import-Export Clause. It stated:

> It is obvious that such nondiscriminatory property taxation can have no impact whatsoever on the Federal Government's exclusive regulation of foreign commerce, probably the most important purpose of the Clause's prohibition. By definition, such a tax does not fall on imports as such because of their place of origin. It cannot be used to create special protective tariffs or particular preferences for certain domestic goods, and it cannot be applied selectively to encourage or discourage any importation in a manner inconsistent with federal regulation.

-25-

*Michelin Tire Corp. v. Wages*, 423 U.S. 276, 286 (1976). In reaching its decision, the Supreme Court examined *Brown v. Maryland*, which held that "a Maryland statute that required importers of foreign goods, and wholesalers selling the same by bale or package, to obtain a license and pay a $50 fee therefor" was prohibited by the Import-Export Clause. *Id.* at 294. The Maryland statute violated the Import-Export Clause because it taxed imported goods differently than domestically produced goods. *Id.* at 296. *Michelin Tire Corp* does not stand for the proposition, as the Debtor suggests, that if a governmental unit imposes the same tax on importers and domestic manufacturers, when the product is sold in the United States, the tax should be uniformly characterized as a customs duty.

As the FETRA assessments against the Debtor did not provide revenue from imports but instead provided revenue based on Debtor's business manufacturing tobacco products in the United States, the Court concludes that the FETRA assessments, as applied to the Debtor, are properly characterized as excise taxes.

C.  The FETRA taxed transactions occurred when the tobacco products were removed from inventory and made available for sale.

Having determined that the FETRA assessments are excise taxes and therefore entitled to priority status under § 507(a)(8)(E) the Court must next determine which assessments fall within the three-year look back period. In a footnote, the USDA admits that its priority claim is limited to those claims on transactions that occurred within the three years immediately preceding September 16, 2016. The Debtor argues that the first quarterly assessment invoice from the USDA entitled to priority status was issued in December 2013. The USDA argues that the first quarterly assessment invoice entitled to priority status was issued in September 2013.

The priority status of the FETRA assessments is governed by § 507(a)(8)(E)(ii), which limits priority claims for excise taxes on "transaction[s] occurring during the three years

-26-

immediately preceding the date of the filing of the petition" if no tax return is required.[18] The

petition date is September 16, 2016. Therefore, under § 507(a)(8)(E)(ii) the three-year period for

priority claims extends to September 16, 2013. The parties disagree as to whether the quarterly

assessment invoice dated in September 2013 is included in the USDA's priority claim. The

Debtor maintains that the September assessment is for transactions that occurred from April 1 to

June 30, 2013 and therefore not within the relevant three-year period. The USDA argues that the

excise tax on the tobacco products removed from inventory from April 1 to June 30, 2013 did not

become due and owning until September 30, 2013 and therefore the quarterly assessment invoice

for September 30, 2013 is entitled to priority status. For reasons explained below, the Court

agrees with the Debtor.

Under § 507(a)(8)(E)(ii), the USDA is granted a priority claim for an excise tax only on

transactions occurring during the relevant three-year period. Under FETRA and its implementing

regulations, quarterly assessments are made based on the amount of tobacco product the

manufacturer removes from inventory for sale during a calendar quarter compared with the

amount of tobacco inventory of the same assigned class removed from inventory for sale

nationwide for the quarter. See 7 U.S.C. § 518d, 26 U.S.C. 5702(f) and 7 C.F.R. § 1463. After

---

[18] The Court notes that FETRA required reporting of the total number of tobacco products removed in a quarter and mandates that "Each manufacturer and importer of tobacco products shall submit to the Secretary a certified copy of each of the returns or forms described by paragraph (2) that are required to be filed with a Federal agency on the same date that those returns or forms are filed, or required to be filed, with the agency. (2) Returns and forms. The returns and forms described by this paragraph are those returns and forms that relate to--(A) the removal of tobacco products into domestic commerce (as defined by section 5702 of Title 26) . . ." 7 U.S.C. § 518d(h).

    In a recent decision by the United States Bankruptcy Court of the Central District of California, which looked at a state tax on the distribution of cigarettes, the court held that a reporting requirement on the "distributions of cigarettes and purchases of stamps and meter register units during the preceding month and any other information as the [state taxing agency] may require to carry out this part" was a return within the meaning of § 507(a)(8)(E). *In re USA Sales, Inc.*, 580 B.R. 852, 858 (Bankr. C.D. Cal. 2018). As the parties both argue under § 507(a)(8)(E)(ii), the Court will analyze the issue under that clause, although it notes that there is persuasive authority and language in the FETRA statute that suggests that the time period should be governed by (i).

the end of each quarter, the USDA sends a "written notice setting forth the amount to be assessed against the manufacturer . . . for the preceding quarterly payment period. The notice for a quarterly period shall be provided not later than 30 days before the date payment is due. . . ." 7 U.S.C. § 518d(d)(1). In accordance with the statute, the USDA sent a quarterly FETRA assessment invoice to each manufacturer regarding the amount due based on the amount of tobacco products it removed from inventory during the prior quarter.

Although the amount of product removed from inventory cannot be calculated and the tax cannot be assessed until after the end of each quarter, the transactions giving rise to liability for the tax are the removal of tobacco product from inventory. Accordingly, under § 507(a)(8)(E)(ii), the Court concludes that the "transaction" upon which the FETRA excise tax is imposed is the removal of product from inventory. Therefore, the relevant transaction date is the date the product is removed from inventory, not the date the USDA sends an invoice for the assessment, nor the date invoice is due.

The Court holds the USDA is entitled to a priority claim under § 507(a)(8)(E)(ii) only for excise taxes assessed under FETRA based on the Debtor's removal of tobacco product from inventory during the three-year period specified in the statute.[19] Because the quarterly assessment invoice for September 2013 covers the quarter ending June 30, 2013, it is entirely for transactions occurring more than three years prior to the Debtor's commencement of is bankruptcy case on September 16, 2016. The USDA is not entitled to a priority claim based on that invoice. The USDA invoice issued in December 2013 is for taxes imposed on transactions

---

[19] *Cf In re Int'l Tobacco Partners, Ltd.,* 468 B.R. 582, 598–99 (Bankr. E.D.N.Y. 2012) (also holding that the transaction for purposes of § 507(a)(8)(E)(ii) is the removal of tobacco product from inventory but reasoning that liability for the FETRA assessment attaches when a tobacco manufacturer removes its tobacco product from inventory for sale).

-28-

occurring from July 1 to September 30, 2013. The USDA is not entitled to a priority claim based on that invoice to the extent it covers transactions occurring before September 16, 2013.

The USDA's priority claims therefore are limited to the invoices dated in December 2013 to December 2014, other than the portion of the December 2013 invoice that imposes a tax on transactions occurring before September 16, 2013. The Court allows a priority claim in favor of the USDA under § 507(a)(8)(E) for the principal amount of USDA's invoices to the extent of taxes imposed on transactions occurring during that period. Any claim for the FETRA assessments and interest thereon, either under a promissory note or otherwise, based on the Debtor's removal of tobacco product from inventory prior to September 16, 2013 is a nonpriority, unsecured claim.

Neither party addressed whether the interest component on a priority claim is likewise entitled to priority. Nor has the USDA provided documentation detailing the amount of interest that accrued on the assessments entitled to priority. Therefore, the Court denies summary judgment as to whether USDA is entitled to a priority claim for accrued interest or in what amount.

CONCLUSION

The Debtor's and USDA's cross motions for summary judgment are each denied in part and granted in part. The Court holds that the FETRA assessments set forth in the invoices issued from December 2013 through December 2014 (but excluding the tax on transactions occurring from July 1, 2013 to September 15, 2013), excluding interest, are excise taxes entitled to priority status under § 507(a)(8)(E). By the Court's calculation this would result in a priority claim of $1,125,727.35 plus the portion of the December 2013 quarterly assessment invoice to the extent

it imposes a tax on transactions occurring after September 15, 2013.[20] The Court denies summary judgment regarding the USDA's claim that interest accrual is entitled to priority status. Any other claim arising from the FETRA assessments on transactions occurring prior to September 16, 2013 is a nonpriority, unsecured claim in the bankruptcy case. Because the evidence before the Court is insufficient to establish the entire amount of the USDA priority claim, the Court will set this matter for further hearing. A separate order will be entered consistent with this memorandum opinion.

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: October 12, 2018.

COPY TO: All counsel of record via CM/ECF.

---

[20] Based on the exhibits presented to the Court, the following FETRA assessments are priority claims within § 507(a)(8)(E). Although the evidence is insufficient for the Court to calculate, also entitled to priority status is a portion of the amount of the December 2013 invoice. The Court notes that the last assessment under FETRA was issued in December 2014 because the assessments were only imposed over a ten-year period. *See* 7 U.S.C. § 518d.

| Invoice Date | Transaction Months | Cigarettes | Cigars | Roll Your Own | Total |
|---|---|---|---|---|---|
| Mar. 2014 | Oct. 1-Dec. 31, 2013 | $96,704.96 | $194,275.43 | $0.00 | $290,980.39 |
| Jun. 2014 | Jan. 1-Mar. 31, 2014 | $96,702.92 | $198,477.32 | $0.00 | $295,180.24 |
| Sep. 2014 | Apr. 1-Jun. 30, 2014 | $69,728.29 | $197,538.25 | $0.00 | $267,266.54 |
| Dec. 2014 | Jul. 1-Sep. 30, 2014 | $74,761.93 | $197,538.25 | $0.00 | $272,300.18 |
| **Total** | | **$337,898.10** | **$787,829.25** | **$0.00** | **$1,125,727.35** |