UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:  SANDIA TOBACCO MANUFACTURERS, INC.,                    No. 16-12335-j11

    Debtor.

## **MEMORANDUM OPINION**

The following motions are before the Court: 1) Debtor's Motion Pursuant to 11 U.S.C. §

363(f) and (m) to Sell Property Free and Clear of Interests ("Motion to Sell" – Docket No. 356),

Debtor's Motion to Approve Auction Procedures ("Auction Procedures Motion" – Docket No.

380), and Debtor's Motion to Assume and Assign Escrow Agreements under 11 U.S.C. § 365

("Motion to Assume and Assign" – Docket No. 382). At issue is whether Sandia Tobacco

Manufacturers, Inc. ("Sandia Tobacco") or Leaves & Shredders, Inc. ("L&S") holds certain

rights with respect to funds held in certain sub-accounts maintained as part of a Qualified Escrow

Fund ("QEF") mandated by statute in connection with Sandia Tobacco's manufacture of

cigarettes under a Private-Label Supply Agreement ("Supply Agreement") between Sandia

Tobacco and Cousins Inc. d/b/a Fresh Choice Tobacco Company ("Fresh Choice").[1] For the

reasons explained below, the Court finds and concludes that Cousins, Inc. ("Cousins") acquired

the rights at issue under the Supply Agreement. Consequently, because Sandia Tobacco no

longer holds the rights to funds if and when released from escrow that it now seeks to sell, the

---

[1] In an earlier Memorandum Opinion (Doc. 485) the Court determined that Cousins Distributing, Inc. had standing to appear and be heard in connection with the Motion to Sell and related motions. In that opinion, the Court noted that it is unclear whether Cousins, Inc., the party identified in the Product and Prices sheet attached to the Supply Agreement, and Cousins Distributing, Inc. are different entities, whether the reference to Cousins, Inc. in the Product and Prices sheet was a mistake, or whether Cousins, Inc. and Cousins Distributing, Inc. are the same entity. For purposes of this Memorandum Opinion, the Court will treat Cousins, Inc. and Cousins Distributing, Inc. as the same entity and refer to it as Cousins. L & S's interest in the sub-accounts is based on Cousins' interest.

Court will deny the Motion to Sell, the Auction Procedures Motion, and the Motion to Assume and Assign.

## BACKGROUND AND PROCEDURAL HISTORY

Sandia Tobacco filed a voluntary petition under chapter 11 of the Bankruptcy Code on September 16, 2016. Sandia Tobacco filed the Motion to Sell on July 30, 2018, the Auction Procedure Motion on October 11, 2018, and the Motion to Assume and Assign on October 11, 2018 (together, the "Motions").

The Court entered a Memorandum Opinion ("Memorandum Opinion on Standing") on July 19, 2019, limited to the issue of whether Bailey Tobacco Company and Cousins had standing to appear and be heard. *See* Doc. 485. The Court determined that L&S, as Cousins' transferee, has standing to object to the Motions because it has a colorable claim to funds, if and when released from escrow, deposited in the QEF under certain sub-accounts established under an escrow agreement between Sandia Tobacco and New Mexico Bank & Trust ("NMBT").[2] *Id.* The Memorandum Opinion on Standing did not determine ownership of the sub-accounts or any interests therein and did not make a ruling on the merits of any issues in the Motions.

Sandia Tobacco and L&S agreed to have the Court decide the Motions, including the nature of the rights "allocated" to Cousins under Schedule A of the Supply Agreement, based on the stipulated facts submitted in anticipation of trial on the merits of the Motions (Docket No. 510), and agreed that the resolution that issue and of the Motions does not require an adversary proceeding. By the parties' stipulation, the exhibits identified in Debtor's Exhibit List for Final

---

[2] The Court determined that Baily Tobacco Company lacked standing. *See* Memorandum Opinion on Standing (Doc. 485), pp. 13-14.

Hearing on Consolidated Contested Matters (Docket No. 515) are admitted into evidence for purposes of deciding the Motions. *See* Doc. 518. Sandia Tobacco and L&S filed briefs, and, with the Court's permission, the States of California, Nevada, Nebraska, Oregon, and Idaho (collectively, "States"), filed an amicus brief (the "Amicus Brief").[3]

## FACTS

The facts set forth in the Stipulated Facts for Trial on the Motion to Sell, Auction Procedures Motion, and Motion to Assume and Assign ("Stipulated Facts" – Docket No. 510) are incorporated by reference in this Memorandum Opinion as if restated herein and constitute findings of the Court. The following recitation of facts is based on the Stipulated Facts and the exhibits admitted in evidence.

A group of forty-six states, the District of Columbia, and five U.S. territories (the "Settling States") commenced litigation against four major U.S. tobacco manufacturers based on health problems caused by use of the manufacturers' tobacco products. In 1998, the Attorneys General of the Settling States and the four major U.S. tobacco manufacturers entered into a Master Settlement Agreement ("MSA") that resolved the litigation. Attached to the MSA as Exhibit T is a model statute. The model statute, as enacted in various states, hereafter is called the "Escrow Statutes." The Escrow Statutes require that a tobacco product manufacturer that sells cigarettes into the state, directly or indirectly through a distributor, retailer or similar intermediary, either become a participating manufacturer ("PM") by becoming a signatory to the

---

[3] *See* Sandia Tobacco Manufacturers, Inc.'s Brief on Contested Matters (Docket No. 520); Leaves and Shredders, Inc.'s – Response to brief on Contested Matters (Docket No. 521); Reply Brief of Sandia Tobacco Manufacturers, Inc. on Contested Matters (Docket No. 522); and The States' Amicus Brief on Contested Matters Related to Debtor's Sale Motion (Docket No. 524).

-3-

MSA, or place a specified amount of funds in a QEF based on the number of individual cigarettes sold ("Units Sold") into the state by the manufacturer. A manufacturer that does not become a signatory to the MSA is known as a Non-Participating Manufacturer or NPM.

Sandia Tobacco is an NPM because it is not a signatory to the MSA. Under applicable Escrow Statutes, Sandia Tobacco, as an NPM, was required to place funds into a QEF. The required deposit amounts are based on Units Sold in a particular state during the prior calendar year.[4]

Consistent with the applicable statutory requirements, on October 29, 2013 Sandia Tobacco entered into an Escrow Agreement with NMBT. Under the Escrow Agreement between Sandia Tobacco and NMBT (the "Escrow Agreement"), Sandia Tobacco established a QEF for the benefit of the Beneficiary States. A Beneficiary State is defined in the Escrow Agreement as "a state that is a party to the Master Settlement Agreement for whose benefit funds are being escrowed pursuant to this Escrow Agreement." *See* Escrow Agreement (Exhibit B), Section 2 ¶ (c). In addition, a separate QEF sub-account was created for the benefit of each Beneficiary State based on Units Sold within that state. *Id.* at Section 3 ¶ (d). The QEF sub-accounts established under the Escrow Agreement are based on the number cigarettes that Sandia Tobacco sold in each Beneficiary State, directly or through an intermediary, irrespective of the cigarette brand.

As required by the Escrow Statutes, the Escrow Agreement provides: "funds shall be released from escrow and revert back to the Company [Sandia Tobacco] twenty-five years after the date on which the applicable annual installments thereof were placed into escrow," *id*. at

---

[4] "Units Sold" is a defined term in the Escrow Statutes. *See, e.g.,* Or. Rev. Stat. Ann. § 323.800(12)(a).

-4-

Section 3, ¶ (f)(iii), and "interest accrued on the funds shall be payable to [Sandia Tobacco] as earned . . . " *Id.* at Section 3, ¶ (h)(i).

To comply with modified escrow agreement requirements in California and Washington, Sandia Tobacco and NMBT later entered into two additional escrow agreements, one dated July 22, 2015 governing California's sub-accounts and the other dated April 14, 2016 governing Washington's sub-accounts. All three escrow agreements hereafter are called the "Escrow Agreements."

In November of 2006, Sandia Tobacco and Fresh Choice Tobacco (Fresh Choice is a d/b/a of Cousins) entered into the Supply Agreement for Sandia Tobacco's manufacture and sale to Cousins of certain quantities of tobacco products according to Fresh Choice's brand specifications for Fresh Choice to market and sell in the United States.[5] The Supply Agreement identifies Sandia Tobacco as the "Supplier" and Fresh Choice as the "Buyer." Schedule A, Product and Prices, attached to the Supply Agreement states that Fresh Choice is a d/b/a of Cousin's Inc.

Schedule A, Product and Prices, attached to the Supply Agreement includes the following provisions:

> Master Settlement Payment Provision. BUYER agrees that SUPPLIER will add an additional $4.29 per carton for 2006 to the base price for product sold into full MSA states. BUYER agrees to make aware their intention in writing 30 days prior to selling the product into any MSA state. SUPPLIER will respond in writing the additional cost for the MSA, as the price will increase annually in accordance with the Master Settlement Agreement, Exhibit C, in order to account for inflation.
>
> > a. Allocation of MSA monies. All MSA monies (principal and interest thereon) received by SUPPLIER from BUYER pursuant to Section 2(d), above, shall be allocated to Cousins, Inc.; Cousins, Inc. being the owner of the *Fresh Choice*

---

[5] *See* Exhibit 3, Debtor's Exhibit List for Final Hearing on Consolidated Contested Matters (Doc. 515).

-5-

brand and BUYER being a d/b/a of Cousins, Inc. Cousins, Inc.'s principal place of business being located at 4477 Park Road, Benica, CA 94510.

BUYER shall only be entitled to receive the monies allocated to them under this section 2(d)(a) upon the release of the MSA escrowed monies pursuant to the Master Settlement Agreement. SUPPLIER is under no obligation or duty, whatsoever, to pay BUYER these monies, but only use its best efforts to facilitate distribution of BUYER'S allocated share, if and when, released from MSA escrow.

Supply Agreement, Schedule A, Product and Prices, ¶ 2(d).

The Supply Agreement contains the following provision restricting assignment:

<u>Binding Effect and Benefits.</u> This Agreement shall be binding upon and shall inure to the benefit of SUPPLIER and BUYER and their respective successors, assigns, transferees and legal representatives; provided, however, the rights and obligations of BUYER under this Agreement shall not be assignable or delegable, in either case, by operation of law or otherwise, by BUYER without the prior written consent of SUPPLIER and any such assignment or delegation without such consent shall be void. Consent to any such assignment or delegation may be withheld or denied by BUYER [sic.] as it may deem appropriate in its sole discretion.

Supply Agreement, ¶ 13(c).

The Supply Agreement contains a survival provision, which states:

The provisions of Sections 3, 4, 5, 10 and 13 and all terms set forth in Schedule B shall survive any termination of this Agreement.

Supply Agreement, ¶ 13(l). The survival provision does not reference Schedule A, Product and Prices, as surviving termination.

After it entered into the Supply Agreement, Sandia Tobacco divided further the sub-accounts established under the Escrow Agreements (i) into "Sandia-A" QEF sub-accounts for Beneficiary States in which Cousins sold cigarettes that Sandia Tobacco manufactured under Cousin's brands (the "Revenge", "Harvest", and "Fresh Choice" brands), and (ii) into "Sandia-B" QEF sub-accounts for Beneficiary States in which Sandia Tobacco sold cigarettes under its own

-6-

brands (the "Sandia" and "Royal" brands). The additional fee per carton added to the base price for the cigarettes Sandia Tobacco manufactured for Cousins under the Supply Agreement was intended to fund the Sandia-A QEF sub-accounts. Cousins paid the funds that Sandia Tobacco deposited into the Sandia-A QEF sub-accounts.

Historically, at the direction of Sandia Tobacco, NMBT paid the interest earned on the Sandia-A QEF sub-accounts to Cousins and/or Marilyn Roscoe who received the funds on behalf of Cousins. At some point Sandia Tobacco ceased manufacturing cigarettes for Cousins. After Sandia Tobacco stopped manufacturing cigarettes for Cousins, Sandia Tobacco continued to direct NMBT to pay the interest earned on the Sandia-A QEF sub-accounts to Cousins per the Supply Agreement. During that time, Sandia Tobacco did not pay taxes on the earned interest from the Sandia-A QEF sub-accounts paid to Cousins. In 2018, Sandia Tobacco's principal, Donna Woody, directed NMBT to stop sending the interest payments from the Sandia-A QEF sub-accounts to Cousins. The last interest payment Cousins received from the Sandia-A QEF sub-accounts was in April of 2018.

In June of 2018, counsel for Sandia Tobacco sent email correspondence to Jeremy Chapman, with a copy to John Roscoe, stating that "Sandia does not claim any beneficial ownership of the Cousins' escrow accounts or interest therefrom" and that "Sandia is not selling your brands or your escrow account."[6] Prior email correspondence from Jeremy Chapman on behalf of Cousins sent to counsel for Sandia Tobacco requests that "[t]he accounts that hold the funds belonging to Cousins for the beneficiary states should be segregated from any other Sandia

---

[6]Stipulated Facts, ¶ 8.g.

escrow accounts" and that "[t]his should demonstrate Cousins' 100% interest in their own escrow funds."[7]

Marilyn Roscoe is the matriarch of the Roscoe family. Her family has been in the tobacco business since 1957. She and her husband named the corporation "Cousins" for their eight grandchildren. The grandchildren were the owners of Cousins. Ms. Roscoe served as president of Cousins while it operated but was not a shareholder. She also served as a director.

Cousins dissolved in 2017. Prior to its dissolution, Ms. Roscoe claims that Cousins' owners renounced their ownership rights to her so that she became the owner of all Cousins' assets. Ms. Roscoe intended to incorporate L&S, which she had been operating as a sole proprietorship, and to list all the assets and liabilities of Cousins on the balance sheet for L&S. Cousins purportedly transferred its interest in the Sandia-A QEF sub-accounts to L&S. The Sandia-A QEF sub-accounts are noted as an asset on the books of L&S through a book entry. A document dated June 3, 2018 titled Consolidation of Companies and signed by Marilyn Roscoe, Evan Fenton Roscoe, Sara Ruth Roscoe, and Dona Mae Roscoe, states that Marilyn Roscoe "consolidated the accounts" of Just Good Tobacco, Cousins, and Truth & Liberty Manufacturing into Leaves & Shredders effective on 2/5/2016" and that the "Master Settlement escrow accounts are listed on the Leaves & Shredders balance sheets along with a contra account." There is no evidence that L&S made any payments that funded the Sandia-A QEF sub-accounts.

The Court previously found in its Memorandum Opinion on Standing that the evidence before the Court establishes, at a minimum, that 1) Cousins paid the funds that were ultimately deposited into the Sandia-A QEF sub-accounts; 2) the Supply Agreement provided that Cousins

---

[7] *Id.*

-8-

would be entitled to receive the monies allocated to it upon the release of the escrowed funds under the MSA; 3) Sandia Tobacco's principal understood the Supply Agreement to mean that, after the twenty-five year release period under the MSA, Cousins would get the money; and 4) Cousins transferred its interest in the Sandia-A QEF sub-accounts to L&S.[8]

Sandia Tobacco filed the Motion to Sell on July 30, 2018. *See* Doc. 357. L&S timely objected to the Motion to Sell. *See* Doc. 366. Sandia Tobacco filed Debtor's Motion to Reject Executory Contract – Fresh Choice Tobacco Company ("Motion to Reject" – Doc. 389) on October 15, 2018. The Motion to Reject was granted by default, after service of notice and expiration of the objection deadline, on December 19, 2018. *See* Doc. 422. Debtor and L&S stipulate that Sandia Tobacco's rejection of the Supply Agreement was effective as of October 15, 2018.[9]

DISCUSSION

I.    Sandia Tobacco's Interests and Obligations Under the Settling States' Escrow Statutes

A QEF is an escrow account that NPMs, like Sandia Tobacco, must establish under applicable Escrow Statutes enacted by each of the Settling States as contemplated by the MSA. The Sandia-A QEF sub-accounts that are the subject of the Motion to Sell are part of a QEF held for the benefit of the states of California, Nevada, Nebraska, Oregon, Idaho, and Missouri.[10] A

---

[8] The parties included these prior findings, as well as the Court's determination that this evidence is sufficient to establish L&S's standing to object to the Motion to Sell, in its Stipulated Facts. *See* Stipulated Facts, ¶ 8.l.
[9] *See* Stipulated Facts, ¶ 6.a.; *see also* Default Order Granting Debtor's Motion to Reject Executory Contract – Fresh Choice Tobacco Company – Doc. 422.
[10] As noted in the Amicus Brief, the Escrow Statutes are all based on the same model act and are substantially similar. The Court will rely on the Escrow Statutes of one of the states at issue as representative examples of the applicable statutory requirements.

-9-

QEF is defined by statute as "an escrow arrangement with a federally or state charted financial institution . . . where such arrangement requires that such financial institution hold the escrowed funds' principal for the benefit of releasing parties [various states] and prohibits the tobacco product manufacturer who is placing the funds into escrow from using, accessing or directing the use of the escrowed funds' principal" except as consistent with the releasing provisions of the Escrow Statutes. Or. Rev. Stat. Ann. § 323.800(8). The Escrow Statutes require NPMs to deposit funds into a QEF based on "units sold" in the particular state in the prior calendar year. *See, e.g.,* Neb. Rev. Stat. Ann. §69-2703(2) (requiring quarterly deposits into a qualified escrow fund "per unit sold"). A tobacco product manufacturer who places funds into a QEF as required by statute "shall receive the interest or other appreciation on such funds as earned." Or. Rev. Stat. Ann. § 323.806(1)(b)(B); Neb. Rev. Stat. Ann. § 60-2703(2)(b) (same). By statute, the funds in a QEF, other than earned interest, may only be released in one of the following circumstances: 1) to pay a judgment or settlement on a claim filed against the tobacco product manufacturer; 2) to the tobacco product manufacturer if the tobacco product manufacturer can demonstrate that it deposited more funds than required under the MSA in a particular year had the NPM been a participating manufacturer; or 3) if funds remain in the QEF twenty-five years after the date the funds were placed into the QEF, to the manufacturer. *See, e.g.,* Or, Rev. Stat. Ann. § 323.806(1)(b)(B)(i) – (iii). It is possible for a tobacco product manufacturer to assign its interest in funds placed in a QEF to the state. *See, e.g.,* Or. Rev. Stat. Ann. § 323.807(1). If an NPM like Sandia Tobacco fails to place funds into a QEF as required by statute, the Attorney General of the state may file a civil action against the NPM on behalf of the state seeking to impose civil penalties. *See, e.g.,* Or. Rev. Stat. Ann. § 323.806(1)(b)(C). The Escrow Statutes do not prohibit

-10-

the transfer or sale of an NPM's right to receive funds if and as released from a QEF, whether such right is to the earned interest on the funds deposited in a QEF or an NPM's right to receive the funds remaining in a QEF twenty-five years after the deposit date. *See S & M Brands, Inc. v. Summers*, 420 F.Supp.2d 840, 846 (M.D. Tenn. 2006) (rejecting argument that an assignment of rights to funds in a QEF upon their release to a third party is prohibited by statute, where party did not point out any express statutory prohibition to assignment).

The Escrow Agreement between Sandia Tobacco and NMBT is consistent with these statutory requirements. Even though the QEF is titled in Sandia Tobacco's name under the Escrow Agreement with NMBT, Sandia Tobacco's rights and interests in the QEF, including the funds in the Sandia-A QEF sub-accounts, are limited by the applicable Escrow Statutes. By the Motion to Sell, Sandia Tobacco seeks to sell its rights under the applicable Escrow Statutes to the interest or other earnings on the funds in the Sandia-A QEF sub-accounts and its statutory right any funds remaining in the Sandia-A QEF sub-accounts twenty-five years after deposit.

II.     The Parties' Interests With Respect to Funds in the Sandia-A QEF Sub-Accounts Under the Supply Agreement

Although the backdrop for the parties' dispute is the specialized area of tobacco product manufacturing and sales, the MSA, and the requirements and obligations under the applicable Escrow Statutes, at the heart of the dispute is the Supply Agreement itself. If under the Supply Agreement Cousins acquired ownership of Sandia Tobacco's right to receive funds released from the Sandia-A QEF sub-accounts, Sandia Tobacco will not be able to sell those rights to a third party. The Supply Agreement is a contract, and the Court must discern its meaning based on ordinary principles of contract interpretation.

-11-

The Supply Agreement provides that New Mexico law applies to its construction and enforcement. *See* Supply Agreement, ¶ 13(f) ("This Agreement shall be governed, construed and enforced in accordance with the internal laws of the State of New Mexico without regard to principles of conflicts of law."). Under New Mexico law, the Court's primary goal in construing a contract "is to ascertain and give effect to the intentions of the parties," considering the agreement as a whole, and giving each part of the contract significance "according to its place." *Manuel Lujan Ins., Inc. v. Jordan*, 1983-NMSC-100, ¶ 6, 100 N.M. 573, 575, 673 P.2d 1306, 1308 (citations omitted).[11] "The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive." *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 23, 299 P.3d 844, 852 (quoting *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.,* 1993-NMSC-039, ¶ 54, 115 N.M. 690, 704, 848 P.2d 66, 80). A contract term is ambiguous only where it "is reasonably and fairly susceptible [to] different constructions." *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 114 N.M. 778, 781, 845 P.2d 1232, 1235. The Court may consider relevant trade usage, course of dealing, and course of performance to evaluate whether a contract term is ambiguous. *ConocoPhilips,* 2013-NMSC-009 at ¶ 23, 299 P.3d at 852 (citing *C.R. Anthony Co. v. Loretto Mall Partners*, 1991-NMSC-070, ¶15, 112 N.M. 504, 508-09, 817 P.2d 238, 242-43). If a contract provision is unambiguous, the Court "is limited to interpreting 'the contract which the parties made for themselves [as a court] may not alter or make a new agreement for the parties.'" *Id.* (quoting

---

[11] *See also Pub. Serv. Co. of N.M. v. Diamond D. Constr. Co.*, 2001-NMCA-082, ¶ 19, 131 N.M. 100, 108, 33 P.3d 651, 659 (The court must "view the contract as a harmonious whole, give meaning to every provision, and accord each part of the contract its significance in light of other provisions."); Restatement (Second) of Contracts § 202 (1981) (contract should be interpreted as a whole in light of all the surrounding circumstances and the parties' principal purpose).

-12-

*Davies v. Boyd*, 1963-NMSC-164, ¶ 4, 73 N.M. 85, 87-88, 385 P.2d 950, 951). Neither Sandia Tobacco nor L&S contend that the terms of the Supply Agreement are ambiguous.

The terms of the Supply Agreement at issue mostly are contained in Schedule A, Product and Prices, specifically, Section 2(d)(a). Under that section, entitled "Allocation of MSA monies,"

> All MSA monies (principal and any interest thereon) received by SUPPLIER from Buyer pursuant to Section 2(d) shall be allocated to Cousins, Inc. . . . .

In addition,

> BUYER shall only be entitled to receive the monies allocated to them [sic.] . . . upon the release of the MSA escrowed monies pursuant to the Master Settlement Agreement.

Finally,

> SUPPLIER is under no obligation or duty, whatsoever, to pay BUYER these monies, but only use its best efforts to facilitate distribution of BUYER's allocated share, if and when, released from MSA escrow.

Under Section 2(d), Sandia Tobacco contracted with Cousins to pass on Escrow Statute QEF funding requirements to Cousins by an adding an additional price per carton to the base price for products sold in MSA states. *See* Supply Agreement, Schedule A, Product and Prices, ¶ 2(d). "All MSA monies (principal and any interest thereon)" in Section 2(d)(a) refers to the monies paid under Section 2(d). The survival provision of the Supply Agreement does not incorporate Schedule A. *See* Supply Agreement, ¶ 13(l). ("The provisions of Sections 3, 4, 5, 10, and 13 and all terms set forth in Schedule B hereto shall survive any termination of this Agreement.").

Sandia Tobacco asserts that Supply Agreement gives Cousins a contract right to the funds placed in Sandia-A QEF sub-accounts if and when released from escrow per the Escrow Statutes that is no longer enforceable after rejection of the Supply Agreement. L&S in effect asserts that

-13-

the Supply Agreement grants Cousins an ownership interest in Sandia Tobacco's rights to the funds if and when released from escrow that is unaffected by contract rejection, termination, or expiration. Both Sandia Tobacco and L&S assert that the Supply Agreement is unambiguous regarding the nature of Cousins' rights or interests with respect to the funds.

The Supply Agreement provides that "[a]ll MSA monies" (referring to the monies Cousins paid Sandia Tobacco for deposit in a QEF and the interest earned on those monies) "shall be *allocated* to Cousins" . . . but "[Cousins] shall only be *entitled* to receive the monies *allocated* to [it] upon release of the escrowed monies . . . ." Schedule A, Product and Prices, ¶ 2(d)(a) (emphasis added).[12] The Supply Agreement provides further that "[Sandia Tobacco] is under no obligation or duty, whatsoever, to pay [Cousins] these monies, but only use its best efforts to facilitate *distribution* of [Cousin's] *allocated share*, if and when, released from . . . escrow." Schedule A, Product and Prices, ¶ 2(d)(a) (emphasis added).

Thus, under the Supply Agreement, Cousins is entitled to a distribution of the funds allocated to it – its "allocated share" – if and when released from escrow. But Sandia Tobacco has no obligation or duty whatsoever to pay the funds to Cousins. Sandia Tobacco's only contractual duty or obligation to Cousins with respect to Sandia-A QEF funds released from escrow is to use its best efforts to facilitate distribution of Cousins' allocated share to Cousins. Distribution of Cousins' allocated share refers to distribution by the escrow agent under the

---

[12] The Supply Agreement is not carefully drafted. Section 2(d)(a) characterizes "MSA monies" as "principal and any interest thereon" received by Sandia Tobacco from Cousins by the additional price per carton added to the base price for products sold in MSA states. Sandia Tobacco did not receive any "interest thereon" from Cousins. Interest was earned on funds in the QEF. Nevertheless, it is clear what the parties intended by that language from their course of performance of the Supply Agreement.

Escrow Agreements of funds in the Sandia-A QEF sub-accounts. [13] Best efforts presumably

would entail instructing the escrow agent, if necessary, to pay Cousins' allocated share of the

funds to Cousins.

The Supply Agreement does not define the term "allocated." The ordinary meaning of

"allocated" is "designate[d] for a special purpose; set apart." American Heritage Dictionary (2d

ed. 1982). Black's Law Dictionary defines "allocable" as "[c]apable of being allocated;

assignable," and "allocation" as "[t]he amount or share of something that has been set aside or

designated for a particular purpose" or "[a] designation or apportionment for a specific purpose;

esp., the crediting of a receipt or the charging of a disbursement to an account <allocation of

funds>." Black's Law Dictionary (11th ed. 2019). Even though conveyance language typically

uses the word assign, convey, or transfer, the definition of "allocate" includes the concept of

assignment. *See* Black's Law Dictionary (11th ed. 2019) ("allocable" means "assignable").

The provision in the Supply Agreement that Sandia Tobacco has no obligation or duty

whatsoever to pay Cousins any funds released from escrow further supports the Court's

interpretation of the Supply Agreement. If Cousins only had an executory contract right under

the Supply Agreement to funds released from escrow payable to Sandia Tobacco, and Cousins

acquired no right to receive the funds independent of enforcement of that executory contract

right, the Supply Agreement ordinarily would contain a corresponding obligation on the part of

Sandia Tobacco to pay the funds to Cousins that Cousins could enforce. Here, however, there is

no such obligation. To the contrary, the Supply Agreement provides that "SUPPLIER is under no

---

[13] Funds released from escrow could be released for disbursement to MSA states. References to what type of right or interest Cousins acquired with respect to funds released from escrow refers to whether Cousins acquired Sandia Tobacco's rights to released funds per the Escrow Statutes.

obligation or duty, whatsoever, to pay BUYER these monies . . . ." Schedule A, Product and Prices, ¶ 2(d)(a).

Use of the terms "allocated," "allocated share," "distribution" and "entitled," coupled with Sandia Tobacco having no obligation or duty under the Supply Agreement to pay any QEF funds released from escrow to Cousins suggests that Cousins had more than a contract right under the Supply Agreement enforceable against Sandia Tobacco. It indicates that Sandia Tobacco assigned to Cousins its rights to the funds in the Sandia-A QEF sub-accounts upon their release from escrow.

Further, considering the Supply Agreement as a whole, it is clear that the parties intended for Cousins to receive not only the interest earned on funds in the Sandia-A QEF sub-accounts but also the residual remaining in those subaccounts twenty-five years after deposit. Twenty-five years after the last deposit would be roughly twenty-five years after Sandia Tobacco stopped selling cigarettes to Cousins under the Supply Agreement. In other words, whenever the Supply Agreement ended (whether through termination or expiration), the final release of the residual of the escrowed funds would not occur for another twenty-five years. Yet, the survival provision of the Supply Agreement does not provide that Schedule A, Product and Prices, which governs distribution of the released funds, survives termination. The fact that the parties did not specify that Schedule A, Products and Prices would survive termination suggests that survival of Schedule A, Products and Prices is unnecessary because Cousins had already been "allocated" (assigned) the right to the Sandia-A QEF funds released from escrow twenty-five years after deposit. This interpretation is consistent with Sandia Tobacco's understanding of the Supply Agreement: "Sandia Tobacco's principal understood the . . . Supply Agreement to mean that,

after the twenty-five-year release period under the MSA, Cousins would get the money." *See* Stipulated Facts, ¶ 8.l. Any other interpretation of the Supply Agreement would mean, contrary to the intent of the parties, that if Cousins terminated the Supply Agreement for cause, it would forfeit all rights to funds released from escrow after termination.

Finally, interpreting the Supply Agreement as an assignment of Sandia Tobacco's interests in the Sandia-A QEF sub-accounts to Cousins through allocation is consistent with Sandia Tobacco's attorney's affirmation of that understanding to opposing counsel. Email correspondence from Sandia Tobacco's counsel to Cousins' counsel affirmed that Sandia Tobacco "does not claim any beneficial ownership in the Cousins' escrow accounts or interest therefrom" and that Sandia Tobacco "is not selling your brands or your escrow account," Although not binding on Sandia Tobacco, it likewise is consistent with the Court's interpretation of the Supply Agreement. [14]

---

[14] Formal concessions in the pleadings, or stipulations by a party or its counsel constitute judicial admissions that bind the party who makes them. *Martinez v. Bally's Louisiana, Inc.,* 244 F.3d 474, 476 (5th Cir. 2001); *see also United States v. E.F.*, 920 F.3d 682, 688 (10th Cir. 2019) (judicial admissions are "formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute.") (quoting *U.S. Energy Corp. v. Nukem, Inc.*, 400 F.3d 822, 833 n.4 (10th Cir. 2005)). Because the statements in the email were not made in a pleading, document, or stipulation filed in this bankruptcy case, the statements do not constitute judicial admissions. Rather, the email communication should be treated as an extrajudicial, evidentiary admission, which is admissible, but not conclusive, and may be controverted or explained by the party who made it. *See Asarco, LLC v. Noranda Mining, Inc.,* 844 F.3d 1201, 1212 n.3 (10th Cir. 2017) ("'[O]rdinary evidentiary admissions' can be controverted or explained by a party, and such admissions include 'pleadings in another case, superseded or withdrawn pleadings in the same case, [and] judicial admissions in another case.'") (quoting 30B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 7026 (Kenneth W. Graham, Jr. & Michael H. Graham eds., 4th ed. 2014)); *Jordan v. Greentree Consumer Discount Co (In re Jordan)*, 403 B.R. 339, 351 (Bankr. W.D. Pa. 2009) ("[A]n evidentiary admission . . . [is] a statement made outside the pending litigation that is inconsistent with a position being taken in the litigation and which is admissible but not conclusive."); *see also* 32 C.J.S. Evidence § 482 ("Admissions are divided into two main categories: judicial admissions, which are admissions appearing of record in the proceedings of a court, and extrajudicial admissions, which are out-of-court statements.")

-17-

III. <u>Sandia Tobacco's Rejection of the Supply Agreement</u>

Sandia Tobacco rejected the Supply Agreement effective October 15, 2018. [15] Rejection of an executory contract constitutes a breach of contract that gives rise to a pre-petition claim by the non-breaching party against the bankruptcy estate. 11 U.S.C. § 365(g) ("[T]he rejection of an executory contract . . . of the debtor constitutes a breach of such contract . . . ."); *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S.Ct. 1652, 1658 (2019) (rejection of an executory contract constitutes a breach of the contract and entitles the counter-party to a pre-petition claim against the bankruptcy estate for damages resulting from the debtor's non-performance). Based on Sandia Tobacco's rejection of the Supply Agreement, Cousins or its assignee or successor in interest would have a pre-petition claim for damages for breach of contract. Such claim would be treated the same as other unsecured non-priority claims against the bankruptcy estate. *In re Valley View Shopping Center, L.P.*, 260 B.R. 10, 25 (Bankr. D. Kan. 2001). Rejection of an executory contract "relieves the debtor of burdensome future obligations" under the contract. *Banning Lewis Ranch Co., LLC v. City of Colorado Springs (In re Banning Lewis Ranch Co., LLC)*, 532 B.R. 335, 344-45 (Bankr. D. Colo. 2015) (quoting *In re Onecast Media, Inc.*, 439 F.3d 558, 563 (9th Cir. 2006)).

---

[15] A contract is executory only if some performance is due by both parties to the contract. *See N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 523 n.6 ("The Bankruptcy Code furnishes no express definition of an executory contract . . . but the legislative history to § 365 indicates that Congress intended the term to mean a contract 'on which performance is due to some extent on both sides.'") (quoting H.R.Rep. No. 95-595, p.347 (1977)); *In re Baird*, 567 F.3d 1207, 1211 (10th Cir. 2009) (adopting the Countryman definition of executory contract). It is not clear whether the Supply Agreement remained executory as of the date Sandia Tobacco filed its voluntary bankruptcy petition. The Motion to Reject recites that Sandia Tobacco has ongoing obligations to cooperate with Fresh Choice to recover funds in the QEF and that other terms and obligations of Fresh Choice under the Supply Agreement survived expiration of the term of the Supply Agreement, but does not specify what those obligations are. *See* Doc. 389. In any event, L&S did not argue that the Supply Agreement is not an executory contract, and the parties agree that Supply Agreement was rejected effective October 15, 2018. *See* Stipulated Facts, ¶ 6.

However, rejection as a breach of the contract "does not eliminate rights the contract had already conferred upon the non-breaching party." *Tempnology*, 139 S.Ct. at 1659. Nor does rejection "'vaporize' the counterparty's rights." *Id.* (quoting *In re Tempnology, LLC*, 559 B.R. 809, 822 (1st Cir. BAP 2016)). Consequently, rejection of an executory contract "cannot rescind rights that the contract previously granted." *Id.* at 1666. Rejection only relieves the debtor from any future performance under the contract. *See Tempnology,* 139 S.Ct. at 1662 (after rejection, "[t]he debtor can stop performing its remaining obligations under the agreement.").

Under the Supply Agreement, Cousins' right to funds released from escrow is not dependent upon any future performance by Sandia Tobacco. For that reason, and because Cousins already acquired Sandia Tobacco's rights to funds in the Sandia-A QEF sub-accounts if and when released from escrow, Sandia Tobacco's rejection of the Supply Agreement does not undo that allocation. *See Simmons Cap. Advisors, Ltd. v. Bachinski (In re Bachinski)*, 393 B.R. 522, 545 (Bankr. S.D. Ohio 2008) (rejection of a settlement agreement as an executory contract "would not reverse a property transfer made in accordance with the agreement prior to its rejection. Thus, rejection of the Settlement Agreement would not have the effect of unwinding the transfer of the . . . Property."). Rejection merely relieves Sandia Tobacco from its future obligation under the Supply Agreement to "use its best efforts to facilitate distribution of BUYER'S allocated share, if and when, released from MSA escrow." Product and Prices, Schedule A, ¶2(d)a.

IV. All remaining arguments are unpersuasive.

*Ownership of the Escrow Accounts*

Both Sandia Tobacco and L&S argue about "ownership" of the Sandia-A QEF sub-accounts. But ownership of the accounts themselves or who provided the funds deposited in the accounts is not what is at issue. Rather, the issue is (a) whether Sandia Tobacco retained its rights to the funds upon release from the Sandia-A QEF sub-accounts under the Escrow Statutes but gave Cousins a contract right to receive the funds that is executory prior to receipt or (b) whether, under the Supply Agreement, Sandia Tobacco assigned its rights to the funds upon release from escrow to Cousins.

Sandia Tobacco is the QEF account holder. Neither party owned the Sandia-A QEF sub-accounts. Those sub-accounts were created as a way to track the funds deposited into the QEF maintained by Sandia Tobacco under the Escrow Agreements. The Sandia-A QEF sub-accounts created under the Escrow Agreements merely accommodated the accounting requirements under the Supply Agreement so that Sandia Tobacco could trace the deposits it made from the funds Cousins paid under Section 2(d) Schedule A, Product and Prices attached to the Supply Agreement. The fact that Sandia Tobacco is the account holder for the QEF, Cousins is the source of the funds ultimately deposited into the Sandia-A QEF sub-accounts, or that Sandia Tobacco could not make the deposit until after Cousins reported the number of Units Sold in a particular state, has no bearing on whether pursuant to the Supply Agreement Sandia Tobacco or Cousins has the right to receive the funds from the Sandia-A QEF sub-accounts upon their release under the Escrow Statutes. In sum, the parties' various arguments relating to funding or ownership of the escrow accounts themselves miss the mark.

-20-

*Sandia Tobacco Has Not Given Written Consent to An Assignment by Cousins to L&S*

Sandia Tobacco argues that the Supply Agreement requires its prior written consent to any assignment of Cousins' rights and obligations under the Supply Agreement, and that Sandia Tobacco has not given its written consent to any assignment of Cousins' rights under the Supply Agreement to L&S. L&S claims to have acquired Cousins' interest in the Sandia-A QEF sub-accounts (more precisely, its rights to funds in those subaccounts if and when released from escrow) through Marilyn Roscoe's Consolidation of Companies in 2018. The rights allocated to Cousins under the Supply Agreement are not a contract right or obligation under the Supply Agreement that would require consent to further assignment. Rather, allocation under the Supply Agreement conferred on Cousins a vested property interest in the future interest earned on the Sandia-A QEF sub-accounts, and in the balance remaining twenty-five years after deposit, upon release from escrow. Because the Supply Agreement allocated (assigned) to Cousins all such rights, making Cousins the owner of those rights to the exclusion of Sandia Tobacco, Sandia Tobacco's written consent to Cousins' assignment or transfer of its own property interest was not required.

*The Effect of Cousins' Dissolution*

Because Sandia Tobacco holds no right or interest in funds released from the Sandia-A QEF sub-accounts, it does not matter whether L&S now holds that interest following Cousins' dissolution. Sandia Tobacco cannot sell an interest it does not hold. Thus, the Court need not address the effect of Cousins' dissolution in 2017 and whether L&S became the owner of

-21-

Cousin's interest in funds released from Sandia-A QEF sub-accounts under the applicable Escrow Statutes.[16]

Rejection of the Supply Agreement relieved Sandia Tobacco from any obligation to facilitate the distribution of funds to be released from escrow to Cousins or its assigns or successor in interest. Thus, Sandia Tobacco has no obligation to give any instruction to the NMBT to distribute any funds to L&S. To receive funds out of escrow, it is incumbent on L&S to satisfy any requirement NMBT may impose on L&S to demonstrate it now holds the rights allocated to Cousins under the Supply Agreement.

*The Supply Agreement as Security Instrument*

Sandia Tobacco argues in the alternative, without admitting that there was an assignment, that any assignment to Cousins of the right to funds upon release from escrow was a sale of accounts that created a security interest under Article 9 of the Uniform Commercial Code. Sandia Tobacco argues further that any such security interest is unperfected and therefore avoidable under 11 U.S.C. § 544(a).

It is true that a sale of accounts can create a security interest under Article 9 of the Uniform Commercial Code. *See* NMSA 1978, § 55-9-109(a)(3) (Article 9 applies to "a sale of accounts . . . . "); NMSA 1978, § 55-1-201(b)(35) ("[s]ecurity interest' includes any interest of a consignor and a buyer of accounts . . . that is subject to Chapter 55, Article 9 NMSA 1978."). However, the allocation of rights to Cousins under the Supply Agreement did not create a

---

[16] The evidence before the Court establishes that L&S has a colorable claim to the funds as Cousins assignee or successor in interest but is insufficient for the Court to make any finding or conclusion that L&S actually has the right to the funds.

security interest under Article 9. The purpose of a security interest is to "secure[ ] payment or performance of an obligation." NMSA 1978 § 55-1-201(35).

Sandia tobacco did not assign to Cousins rights to funds upon release from the Sandia-A QEF sub-accounts as collateral for Sandia Tobacco's future payment obligations to Cousins under the Supply Agreement. Sandia Tobacco did not have any payment obligations to Cousins under the Supply Agreement. Sandia Tobacco's obligations were to produce tobacco products for Cousins at the agreed upon prices.

Nor did Sandia Tobacco assign to Cousins rights to funds upon release from escrow as collateral for Sandia Tobacco's performance obligations under the Supply Agreement. The grant was designed to give Cousin's the benefit of the extra money it paid Sandia Tobacco to fund the Sandia-A QEF sub-accounts. Because the "allocation" to Cousins under the Supply Agreement did not function as collateral, Sandia Tobacco's Uniform Commercial Code argument fails.

*L&S's Remaining Arguments*

In light of the Court's ruling, it need not address L&S's remaining arguments, including imposition of a constructive trust, unjust enrichment, Sandia Tobacco acting as fiduciary or agent for Cousins, or Cousins' asserted status as an NMP under the Escrow Statues. Many of L&S's legal arguments, including those regarding the operation of the Escrow Statutes and the MSA, are patently incorrect. The states of California, Nevada, Nebraska, Oregon, and Idaho corrected the many misstatements of the law regarding the operation of the Escrow Statutes and the MSA in their Amicus Brief, and the Court appreciates their input.

-23-

CONCLUSION

Based on the foregoing, the Court concludes that by allocating "All MSA monies (principal and any interest thereon)" to Cousins under the Supply Agreement, Sandia Tobacco assigned to Cousins all of Sandia Tobacco's rights to the funds if and when released from the Sandia-A QEF sub-accounts. Cousins acquired ownership of those rights consistent with applicable Escrow Statutes. These are the same rights Sandia Tobacco now seeks to sell. Sandia Tobacco cannot sell a right or interest it does not hold. The Court will, therefore, deny the Motion to Sell, the Auction Procedures Motion, and the Motion to Assume and Assign and enter separate orders consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket:   July 19, 2021

COPY TO:

William F. Davis
Attorney for Sandia Tobacco
William F. Davis & Assoc. PC
6739 Academy Rd. NE, Ste 256
Albuquerque, NM 87109

William Stewart Bernheim
Attorney for L&S
Bernheim & McCready
255 North Lincoln St
Dixon, CA 95620

Karen Ruth Cordry
National Assn of Attorneys General
2030 M St., NW, Eighth Floor
Washington, DC 20036

-24-